### In re WASHINGTON MUTUAL, INC., et al., Debtors.

### No. 08–12229 (MFW).

United States Bankruptcy Court, D. Delaware.

Sept. 13, 2011.

Mark D. Collins, Esquire, Chun I. Jang, Esquire, Lee E. Kaufman, Esquire, Richards, Layton & Finger, P.A., Wilmington, DE, Brian S. Rosen, Esquire, Marcia L. Goldstein, Esquire, Michael F. Walsh, Esquire, Weil Gotshal & Manges, LLP, New York, NY, for Debtors.

Rafael X. Zahralddin–Aravena, Esquire, Neil R. Lapinski, Esquire, Shelley A. Kinsella, Esquire, Elliott Greenleaf, Wilmington, DE, Peter E. Calamari, Esquire, Michael B. Carlinsky, Esquire, Susheel Kirpalani, Esquire, David Elsberg, Esquire, Quinn Emanuel Urquhart & Sullivan, LLP, New York, NY, Special Litigation and Conflicts Counsel for Debtors.

Robert S. Brady, Esquire, M. Blake Cleary, Esquire, Jaime N. Luton, Esquire, Young Conaway Stargatt & Taylor, LLP Wilmington, DE, Thomas R. Califano, Esquire, John J. Clark, Jr., Esquire, DLA Piper LLP, New York, NY, for FDIC–Receiver.

Jeffrey M. Schlerf, Esquire, Eric M. Sutty, Esquire, Fox Rothschild LLP, Wilmington, DE, David S. Rosner, Esquire, Adam L. Shiff, Esquire, Paul M. O'Connor, Esquire, Seth A. Moskowitz, Esquire, Kasowitz, Benson, Torres & Friedman LLP, New York, NY, for Washington Mutual, Inc. Noteholders' Group.

David B. Stratton, Esquire, Evelyn J. Meltzer, Esquire, Pepper Hamilton LLP, Wilmington, DE, Fred S. Hodara, Esquire, Robert A. Johnson, Esquire, Akin Gump Strauss Hauer & Feld LLP, New York, NY, for Official Committee of Unsecured Creditors.

Jane M. Leamy, Esquire, Office of the United States Trustee, Wilmington, DE.

Adam G. Landis, Esquire, Matthew B. McGuire, Esquire, Landis, Rath & Cobb, LLP, Wilmington, DE, Robert A. Sacks, Esquire, Stacey R. Friedman, Esquire, Brian D. Glueckstein, Esquire, Sullivan & Cromwell LLP, New York, NY, Brent J. McIntosh, Esquire, Sullivan & Cromwell LLP, Washington, DC, for JP Morgan Chase Bank, N.A.

Bernard G. Conaway, Esquire, Marla Rosoff Eskin, Esquire, Kathleen Campbell Davis, Esquire, Campbell & Levine LLC, Wilmington, DE, Sigmund S. Wissner–Gross, Esquire, Robert J. Stark, Esquire, Katherine S. Bromberg, Esquire, Brown Rudnick LLP, New York, NY, James W. Stoll, Esquire, Jeremy B. Coffey, Esquire, Jennifer M. Recht, Esquire, Ryan S. Moore, Esquire, Daniel J. Brown Esquire, Brown Rudnick LLP, Boston, MA, for TPS Holders.

Mark E. Felger, Esquire, Cozen O'Connor, Wilmington, DE, Co–Counsel for Broadbill Investment Corp.

Paul N. Silverstein, Esquire, Jeremy B. Reckmeyer, Esquire, Andrews Kurth LLP, New York, NY, for Broadbill Investment Corp.

Scott J. Leonhardt, Esquire, Frederick B. Rosner, Esquire, The Rosner Law Group LLC, Wilmington, DE, Arthur Steinberg, Esquire, King & Spalding, Jonathan Hochman, Esquire, Schindler Cohen & Hochman LLP, New York, NY, for Nantahala Capital Partners LP and Blackwell Capital Partners LLC.

David P. Primack, Esquire, Drinker Biddle & Reath LLP, Jay W. Eisenhofer, Esquire, Geoffrey C. Jarvis, Esquire, Christine M. Mackintosh, Grant & Eisenhofer P.A., Wilmington, DE, Jeffrey M. Schwartz, Esquire, Chicago, IL, for WMB Noteholders.

Michael P. Migliore, Esquire, Smith, Katzenstein & Jenkins LLP, Wilmington, DE, Andrew J. Mytelka, Esquire, Frederick E. Black, Esquire, Tara B. Annweiler, Esquire, James M. Roquemore, Esquire, Galveston, TX, for North America National Insurance Company, American National Property and Casualty Company, Farm Family Life Insurance Company, Farm Family Casualty Insurance Company, and, National Western Life Insurance Company.

Philip Schnabel (Pro se), Radeberg, Germany, Objector to Confirmation.

Ronald S. Gellert, Esquire, Byra M. Keilson, Esquire, Eckert Seamans Cherin & Mellott, LLC, Wilmington, DE, Matthew Feldman, Esquire, Robin Spigel, Esquire, Willkie Farr & Gallagher LLP, New York, NY, for Truck Insurance Company and Fire Insurance Company.

Edward W. Ciolko, Esquire, Joshua C. Schumacher, Esquire, Barroway Topaz Kessler Meltzer & Check, LLP, Radnor, PA, for Objectors to Confirmation, Robert Alexander & James Lee Reed.

William P. Bowden, Esquire, Gregory A. Taylor, Esquire, Stacy L. Newman, Esquire, Ashby & Geddes, P.A., Wilmington, DE, Stephen D. Susman, Esquire, Seth D. Ard, Esquire, Susman Godfrey, L.L.P., New York, NY, Parker C. Foise, Esquire, Edgar Sargent, Esquire, Justin A. Nelson, Esquire, Susman Godfrey, L.L.P., Seattle, WA, for the Official Committee of Equity Security Holders of Washington Mutual, Inc., et al.

Jeffrey S. Schultz (Pro se), Vice President/Trust Investment Officer, American National Bank, Wichita Falls, TX, Objector to Confirmation.

Nate Thoma (Pro se), Wenonah, NJ, Objector to Confirmation.

Donna L. Harris, Esquire, Pinckney, Harris & Weidinger, LLC, Wilmington, DE, Robert T. Scott, Esquire, Axicon Partners, LLC, New York, NY, for Sonterra Capital Partners and Sonterra Capital LLC.

## *OPINION*[1]

MARY F. WALRATH, Bankruptcy Judge.

Before the Court is the request of Washington Mutual, Inc. ("WMI") and WMI Investment Corp. (collectively the "Debtors") for confirmation of the Modified Sixth Amended Joint Plan of Affiliated Debtors (the "Modified Plan"). For the reasons stated below, the Court will deny confirmation of the Modified Plan.

## I. *BACKGROUND*

WMI is a bank holding company that formerly owned Washington Mutual Bank ("WMB"). WMB was the nation's largest savings and loan association, having over 2,200 branches and holding $188.3 billion in deposits. Beginning in 2007, revenues and earnings decreased at WMB, causing WMI's asset portfolio to decline in value. By September 2008, in the midst of a global credit crisis, the ratings agencies had significantly downgraded WMI's and WMB's credit ratings. A bank run ensued; over $16 billion in deposits were withdrawn from WMB in a ten-day period beginning September 15, 2008.

On September 25, 2008, WMB's primary regulator, the Office of Thrift Supervision (the "OTS"), seized WMB and appointed the Federal Deposit Insurance Corporation (the "FDIC") as receiver. The FDIC's takeover of WMB marked the largest bank failure in the nation's history. On the same day, the FDIC sold substantially all of WMB's assets, including the stock of WMB's subsidiary, WMB fsb, to JPMorgan Chase Bank, N.A. ("JPMC") through a Purchase & Assumption Agreement (the "P & A Agreement"). Under the P & A Agreement, JPMC obtained substantially all of the assets of WMB for $1.88 billion plus the assumption of more than $145 billion in deposit and other liabilities of WMB. The FDIC, as the receiver of WMB, retained claims that WMB held against others.

On September 26, 2008, the Debtors filed petitions under chapter 11 of the Bankruptcy Code. Early in the bankruptcy case disputes arose among the Debtors, the FDIC, and JPMC regarding ownership of certain assets and various claims that the parties asserted against each oth-

1. This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bank- ruptcy Procedure, which is made applicable to contested matters by Rule 9014 of the Federal Rules of Bankruptcy Procedure.

er. Those disputes (and disputes between the Debtors and other claimants) were the subject of litigation in this Court,[2] as well as in the United States District Court for the District of Columbia (the "DC Court"),[3] and in the Federal Court of Claims.[4]

On March 12, 2010, the parties announced that they had reached a global settlement agreement (the "GSA"). The GSA resolved issues among the Debtors, JPMC, the FDIC in its corporate capacity and as receiver for WMB, certain large creditors (the "Settlement Noteholders"),[5] certain WMB Senior Noteholders, and the Creditors' Committee. The GSA was incorporated into the Sixth Amended Plan which was originally filed on March 26, 2010, and modified on May 21 and October 6, 2010.

Hearings on confirmation of the Sixth Amended Plan, as well as argument on summary judgment motions in the related LTW and TPS Adversaries, were held on December 1–3 and 6–7, 2010. The matter was taken under advisement. In an Opinion and Order dated January 7, 2011, the Court concluded that the GSA was fair and reasonable, but declined to confirm the Debtors' Sixth Amended Plan because of certain deficiencies. *In re Wash. Mut., Inc.*, 442 B.R. 314, 344–45, 365 (Bankr. D.Del.2011) (the "January 7 Opinion"). By separate Opinion and Order, the Court found that certain purported holders of the Trust Preferred Securities (the "TPS") no longer had any interest in the TPS because their interests had been converted to interests in preferred stock of WMI. *In re Wash. Mut., Inc.*, 442 B.R. 297, 304 (Bankr.D.Del.2011). In another Opinion and Order issued that day, the Court held that it was unable to grant WMI's motion for summary judgment in the LTW Adversary, because there are genuine issues of material fact in dispute. *In re Wash. Mut., Inc.*, 442 B.R. 308, 313–14 (Bankr. D.Del.2011). Trial on the LTW Adversary has been scheduled for September 12–14, 2011.

The Sixth Amended Plan and the GSA were modified on March 16 and 25, 2011, in an attempt to address the Court's concerns expressed in the January 7 Opinion. (D 255; D 253.)[6] The Modified Plan is

---

2. *See, e.g., Black Horse Capital LP, et al. v. JPMorgan Chase Bank, N.A.*, Bankr.No. 08–12229, Adv. No. 10–51387 (Bankr.D.Del. July 6, 2010) (the "TPS Adversary"); *Broadbill Investment Corp. v. Wash. Mut., Inc.*, Bankr. No. 08–12229, Adv. No. 10–50911 (Bankr. D.Del. Apr. 12, 2010) (the "LTW Adversary"); *Wash. Mut., Inc. v. JPMorgan Chase Bank, N.A.*, Bankr.No. 08–12229, Adv. No. 09–50934 (Bankr.D.Del. Apr. 27, 2009); *JPMorgan Chase Bank, N.A. v. Wash. Mut., Inc.*, Bankr.No. 08–12229, Adv. No. 09–50551 (Bankr.D.Del. Mar. 24, 2009).

3. *Am. Nat. Ins. Co. v. JPMorgan Chase & Co.*, 705 F.Supp.2d 17, 21 (D.D.C.2010) (the "AN-ICO Litigation"); *Wash. Mut., Inc. v. F.D.I.C.*, No. 1:09–cv–00533 (D.D.C. January 7, 2010).

4. *Anchor Savings Bank FSB v. United States*, No. 95–039C (Fed.Cl.1995) (hereinafter the "Anchor Litigation"); *American Savings*

*Bank, F.A. v. United States*, No. 92–872C (Fed. Cl.1992) (hereinafter the "American Savings Litigation").

5. The Settlement Noteholders are Appaloosa Management, L.P. ("Appaloosa"), Aurelius Capital Management LP ("Aurelius"), Centerbridge Partners, LP ("Centerbridge"), and Owl Creek Asset Management, L.P. ("Owl Creek"), and several of their respective affiliates.

6. References to pleadings on the Docket at "D.I. # ;" the Transcripts of the hearings are "Tr. date;" the Debtors' trial exhibits are "D # ;" the Debtors' demonstrative exhibits are "D Demo # ;" the Equity Committee's exhibits are "EC # ;" Aurelius' exhibits are "Au # ;" the TPS Consortium's exhibits are "TPS # ;" the Appaloosa/Owl Creek exhibits are "AOC # ;" and the WMI Senior Noteholders' Group exhibits are "WMI NG # ."

supported by the Debtors, JPMC, the FDIC, the Creditors' Committee, the WMI Senior Noteholders' Group, the Plaintiffs in the ANICO Litigation, and the Indenture Trustees of the Senior, the Senior Subordinated, and the PIERS[7] (collectively, the "Plan Supporters").[8] The Modified Plan is still opposed by the Equity Committee, the putative holders of the TPS,[9] holders of Litigation Tracking Warrants (the "LTW Holders"), certain WMB Noteholders, Normandy Hill Capital L.P., and several individual shareholders and creditors[10] (collectively, the "Plan Objectors"). Hearings were held on July 13–15 and 18–21, 2011, to consider confirmation of the Modified Plan. Post-hearing briefs were filed by interested parties on August 10, 2011, and oral argument was heard on August 24, 2011. The matter is now ripe for decision.

## II. *JURISDICTION*

Congress has legislated that the Bankruptcy Court has core subject matter jurisdiction over approval of settlements of claims and counterclaims and confirmation of plans of reorganization. 28 U.S.C. §§ 1334 & 157(b)(2)(A), (B), (C), (K), (L), (M), (N), & (O).

The TPS Consortium contends, however, that the Court cannot enter a final order on confirmation for two reasons. First, the TPS Consortium argues that the Bankruptcy Court lacks jurisdiction to confirm the Modified Plan because to do so the Court must decide the estate's claims against JPMC and the FDIC, over which only an Article III court has jurisdiction. *Stern v. Marshall,* —— U.S. ——, 131 S.Ct. 2594, 2609, 180 L.Ed.2d 475 (2011). At the commencement of the confirmation hearings, the TPS holders acknowledged that the Bankruptcy Court had authority to conduct the confirmation hearing but asserted that the Court could not enter a final order. Instead, the TPS Consortium contended that the Bankruptcy Court must present proposed findings of fact and conclusions of law to the District Court, for consideration de novo. 28 U.S.C. § 157(c)(1).

Second, the TPS Consortium argues that the Bankruptcy Court has been divested of jurisdiction over the disputed TPS because the TPS Consortium has appealed the Court's ruling in the TPS Adversary that they no longer have any interest in the TPS but only have an interest in WMI preferred stock. *Wash. Mut.,* 442 B.R. at 304. It contends that, as a result, the Court must order that the TPS be escrowed (and not transferred to JPMC pursuant to the GSA and the Modified Plan) until the District Court rules on the pending appeal.

### A. *Effect of Stern v. Marshall*

The TPS Consortium argues that under the Supreme Court's recent decision in *Stern v. Marshall,* the Bankruptcy Court

---

**7.** The PIERS are Preferred Income Equity Redeemable Securities issued by the Washington Mutual Capital Trust 2001 ("WMCT 2001"). The proceeds received by WMCT 2001 were used to purchase junior subordinated deferrable interest debentures issued by WMI. (*See* WMI NG 7.)

**8.** Many of the Plan Supporters do, however, request certain changes to the Modified Plan, some of which conflict with other requested changes.

**9.** The TPS holders have now divided into two groups, with separate counsel, making separate arguments. They are referred to herein as the TPS Group and the TPS Consortium.

**10.** The individual Plan Objectors include Philipp Schnabel, William Duke, James Berg, Kermit Kubitz, Charles McCurry, and Bettina M. Haper.

does not have jurisdiction over the claims the estate has against JPMC or the FDIC (and does not have jurisdiction to approve any settlement of those claims) because the underlying claims are "the stuff of the traditional actions at common law tried by the courts at Westminster" and must be decided by an Article III court. 131 S.Ct. at 2609 (quoting *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 90, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982)). The TPS Consortium argues that *Stern v. Marshall* is directly applicable in this case because the underlying disputes with JPMC and the FDIC are typical of causes of action which only Article III courts can adjudicate, involving state corporate law, tort law, fraudulent conveyance law, as well as federal intellectual property and tort claims. The TPS Consortium argues that this is not a matter within the "particularized area of law" with which bankruptcy courts typically deal and are considered experts at resolving. *Id.* at 2615. It contends that this is so even though Congress has expressly granted core jurisdiction to this Court pursuant to section 157(b)(2). *Id.* at 2608 (holding that bankruptcy court did not have jurisdiction over state law counterclaim to a filed proof of claim despite core jurisdiction designation in 28 U.S.C. § 157(b)(2)(C)).

The Plan Supporters disagree with the TPS Consortium's reading of the *Stern v. Marshall* decision. They note that the Supreme Court itself recognized the narrowness of its ruling. 131 S.Ct. at 2620 (finding that Congress had exceeded Article III's limitation "in one isolated respect" and finding only that the bankruptcy court lacked authority to enter a final judgment on a counterclaim arising under state law which did not need to be resolved in order to rule on the proof of claim). *See also Salander O'Reilly Galleries*, No. 07–30005, 2011 WL 2837494, at *6 (Bankr.S.D.N.Y. July 18, 2011) (concluding that the Supreme Court's opinion in *Stern v. Marshall* emphasizes that it is limited to the particular circumstances surrounding the estate's counterclaim in that case).

In *Stern v. Marshall*, the Supreme Court held that to find bankruptcy court jurisdiction the court must consider "whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process." 131 S.Ct. at 2618. The concurring opinion also suggested that in instances where there is "a firmly established historical practice" allowing non-Article III judges to make a determination, they should be permitted to continue doing so. *Id.* at 2621 (concurring opinion).

■ The Court concludes that the *Stern v. Marshall* decision does not support the TPS Consortium's contention that the Court lacks jurisdiction over the GSA or confirmation of the Modified Plan for several reasons.

### 1. *Historical context*

Approval of settlements by bankruptcy courts is "a firmly established historical practice" that stretches back before the enactment of the Bankruptcy Code to the Bankruptcy Act and, therefore, the bankruptcy court may continue to exercise that jurisdiction. *Id.*

Currently, Rule 9019 provides the court with the authority to "approve a compromise or settlement." Fed. R. Bankr.P. 9019(a). Bankruptcy Rule 9019 is the successor to Bankruptcy Rule 919, which provided "on application by the trustee or receiver and after hearing on notice to the creditors ... the court may approve a compromise or settlement." Fed. R. Bankr.P. 919(a) (1982) (repealed). *See Magill v. Springfield Marine Bank (In re Heissinger Res. Ltd.)*, 67 B.R. 378, 382 (C.D.Ill.1986) (noting that Bankruptcy

Rule 9019 is similar to Rule 919, "which had been interpreted to give the bankruptcy court broad authority to approve compromises"). Rule 919 was based on section 27 of the Bankruptcy Act which stated that "the receiver or trustee may, with approval of the court, compromise any controversy arising in the administration of the estate upon such terms as he may deem for the best interest of the estate." 11 U.S.C. § 50 (1976) (repealed 1978).

Compromises were routinely approved under the Bankruptcy Act and continue to be approved by bankruptcy courts in the context of almost every bankruptcy case. *See, e.g., Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968) (holding that "[c]ompromises are 'a normal part of the process of reorganization.'") (quoting *Case v. L.A. Lumber Prods. Co.,* 308 U.S. 106, 130, 60 S.Ct. 1, 84 L.Ed. 110 (1939)); *Myers v. Martin (In re Martin),* 91 F.3d 389, 393 (3d Cir.1996) ("To minimize litigation and expedite the administration of a bankruptcy estate, '[c]ompromises are favored in bankruptcy.' ... Indeed, it is an unusual case in which there is not some litigation that is settled between the representative of the estate and an adverse party.") (quoting 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)); *In re Okwonna–Felix,* No. 10–31443–H4–13, 2011 WL 3421561, at *4 (Bankr.S.D.Tex. Aug. 3, 2011) (holding that *Stern v. Marshall* does not preclude a bankruptcy court from exercising jurisdiction to consider a settlement which is based "entirely on federal bankruptcy law (both [Rule 9019] and the case law instructing how to apply the Rule)"); *In re Drexel Burnham Lambert Grp., Inc.,* 138 B.R. 723, 758 (Bankr.S.D.N.Y.1992) ("Compromises are favored by the Courts because they allow the estate to avoid the expenses and burdens associated with litigating contested claims.") (citations omit-

ted). *See generally* Reynaldo Anaya Valencia, *The Sanctity of Settlements and the Significance of Court Approval: Discerning Clarity from Bankruptcy Rule 9019,* 78 Or. L. Rev. 425, 431–32 (1999) ("The glue that often holds the bankruptcy process together is the ability of parties to resolve disputes by settlement instead of litigation. If bankruptcy judges had to try a much larger percentage of matters than they currently do, the system would surely bog down. Thus, the sanctity of settlements can hardly be overemphasized.") (footnotes omitted).

Settlements are often included in a plan of reorganization. Valencia, *The Sanctity of Settlements,* 78 Or. L. Rev. at 447. Indeed, section 1123(b)(3)(A) of the Bankruptcy Code expressly states that "a plan may ... provide for the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3)(A). Confirmation of a plan of reorganization is within the bankruptcy court's core jurisdiction. 28 U.S.C. § 157(b)(2)(L). *See also In re AOV Indus., Inc.,* 792 F.2d 1140, 1145–46 (D.C.Cir. 1986) ("The approval of a disclosure statement and the confirmation of a reorganization plan are clearly proceedings at the core of bankruptcy law.... Accordingly, we find that the bankruptcy court had jurisdiction to approve [them].").

2. *Nature of settlement approval*

Second, there is a fundamental difference between approval of a settlement of claims (which the Court is being asked to do here) and a ruling on the merits of the claims. *See, e.g., Matsushita Elec. Indus. Co., Ltd. v. Epstein,* 516 U.S. 367, 382, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996) (holding that a Delaware Chancery Court judgment settling shareholders' state and federal claims was entitled to preclusive effect because "[w]hile it is true that the state court

assessed the general worth of the federal claims in determining the fairness of the settlement, such assessment does not amount to a judgment on the merits of the claims.").

■ As an initial matter, a court does not have to have jurisdiction over the underlying claims in order to approve a compromise of them. *See, e.g., Matsushita Elec.*, 516 U.S. at 381, 116 S.Ct. 873 (holding that "[w]hile § 27 prohibits state courts from adjudicating claims arising under the Exchange Act, it does not prohibit state courts from approving the release of Exchange Act claims in the settlement of suits over which they have properly exercised jurisdiction, i.e., suits arising under state law or under federal law for which there is concurrent jurisdiction."); *Grimes v. Vitalink Commc'ns Corp.*, 17 F.3d 1553, 1563 (3d Cir.1994) (stating that "[w]hile this rule of law may seem anomalous at first glance, it is widely recognized that courts without jurisdiction to hear certain claims have the power to release those claims as part of a judgment" approving a settlement including "federal courts entering judgments that release state claims that they would not have jurisdictional competency to entertain in the first instance" because "[t]his rule of law serves the important policy interest of judicial economy by permitting parties to enter into comprehensive settlements") (citations omitted). *Cf. Musich v. Graham (In re Graham)*, Adv. No. 11–01073, 2011 WL 2694146, at *3 n. 27 (Bankr.D.Colo. July 11, 2011) (analyzing *Stern v. Marshall* decision and concluding that bankruptcy court had statutory and constitutional jurisdiction to determine dischargeability of a criminal/tort claim over which it did not have jurisdiction).

The standards which a court must apply in considering a settlement establish that the court is not rendering a final decision on the merits of the underlying claims being compromised. *See, e.g., TMT Trailer Ferry*, 390 U.S. at 424, 88 S.Ct. 1157 (finding that a bankruptcy judge should form "an educated *estimate* of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise.") (emphasis added); *In re W.T. Grant Co.*, 699 F.2d 599, 608 (7th Cir.1989) (in approving a settlement, the responsibility of the bankruptcy court "is not to decide the numerous questions of law and fact raised ... but rather to canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'") (citations omitted); *In re Martin*, 212 B.R. 316, 319 (8th Cir. BAP 1997) (stating that "it is not necessary for a bankruptcy court to conclusively determine claims subject to a compromise, nor must the court have all of the information necessary to resolve the factual dispute, for by so doing, there would be no need of settlement.").

The "lowest point in the range of reasonableness" is far from the standard required for an Article III court to enter a final determination on the merits of the claims. The Court's conclusion in the January 7 Opinion was not a decision on the merits of the underlying claims but merely a determination that the settlement of those claims by the Debtors on the terms of the GSA was reasonable. *Wash. Mut.*, 442 B.R. at 345.

### 3. *Nature of claims compromised*

Third, the approval of the GSA in this case is particularly within the core jurisdiction of the Bankruptcy Court because it deals with a determination of what is property of the estate. *See* 11 U.S.C. § 541(a) (stating that "[t]he commencement of a

case under ... this title creates an estate [which] is comprised of all the following property, wherever located and by whomever held ... [including] all legal or equitable interests of the debtor in property.").

In this case, the claims which are resolved by the GSA largely relate to who owned specific property: the bank deposits in the name of WMI at WMB and WMB, fsb; the tax refunds due for the consolidated tax group which included WMI and WMB; the TPS; intellectual property; employee related assets (including pension plans and insurance policies); the goodwill litigation that was the subject of the Litigation Tracking Warrants (the "LTWs"); and various other miscellaneous assets. *Wash. Mut.*, 442 B.R. at 330–44.

■ It is without question that bankruptcy courts have exclusive jurisdiction over property of the estate. *See* 28 U.S.C. § 1334(e) (stating that the court in which a case under title 11 is commenced or is pending "shall have exclusive jurisdiction—(1) of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate"). *See also, Cent. Va. Cmty. Coll. v. Katz,* 546 U.S. 356, 363–64, 126 S.Ct. 990, 163 L.Ed.2d 945 (2006) (stating that "[c]ritical features of every bankruptcy proceeding are the exercise of exclusive jurisdiction over all of the debtor's property....").

■ That jurisdiction includes jurisdiction to decide whether disputed property is, in fact, property of the estate. *See, e.g., Salander O'Reilly Galleries,* 453 B.R. 106, 122–23 (concluding that the bankruptcy court had core jurisdiction to decide priority of estate's and creditor's asserted interests in a piece of art and denying request for arbitration of issue); *Mata v. Eclipse Aerospace, Inc. (In re AE Liquidation, Inc.),* 435 B.R. 894, 904–05 (Bankr.D.Del. 2010) (holding that the bankruptcy court

had exclusive jurisdiction to determine whether or not disputed aircraft was property of the estate at the time of its sale); *Williams v. McGreevey (In re Touch Am. Holdings, Inc.),* 401 B.R. 107, 117 (Bankr. D.Del.2009) (stating approvingly that "[v]arious courts have concluded that matters requiring a declaration of whether certain property comes within the definition of 'property of the estate' as set forth in Bankruptcy Code § 541 are core proceedings.").

For all the above reasons, the Court concludes that it has jurisdiction to decide confirmation of the Modified Plan which incorporates the GSA resolving the disputed claims to putative property of the Debtors' estate.

**B.** *Effect of Appeal of TPS Ruling*

■■ The TPS Consortium argues further that the Court is precluded from confirming the Modified Plan by the Divestiture Rule which provides that an appeal divests the lower court of any further jurisdiction over the subject of the appeal. *See, e.g., Griggs v. Provident Consumer Disc. Co.,* 459 U.S. 56, 58, 103 S.Ct. 400, 74 L.Ed.2d 225 (1982) ("The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."); *Venen v. Sweet,* 758 F.2d 117, 120–21 (3d Cir. 1985) (" 'Divest' means what it says—the power to act, in all but a limited number of circumstances, has been taken away and placed elsewhere."); *Bialac v. Harsh Inv. Corp. (In re Bialac),* 694 F.2d 625, 627 (9th Cir.1982) ("Even though a bankruptcy court has wide latitude to reconsider and vacate its own prior decisions, not even a bankruptcy court may vacate or modify an order while on appeal."); *In re Whispering Pines Estates,* 369 B.R. 752, 757 (1st Cir.

BAP 2007) ("It is well established that the filing of a notice of appeal is an event of jurisdictional significance in which a lower court loses jurisdiction over the subject matter involved in the appeal. The purpose of the general rule is to avoid the confusion of placing the same matter before two courts at the same time and preserve the integrity of the appeal process.") (citations omitted); *In re Demarco*, 258 B.R. 30, 32 (Bankr.M.D.Fla.2000) ("The parties appear to agree that the Court does not have jurisdiction to consider matters which would interfere with the appeal and the jurisdiction of the appellate court, but that the Court does have jurisdiction over, and should proceed with, other aspects of the case."); *In re Strawberry Square Assocs.*, 152 B.R. 699, 701 (Bankr. E.D.N.Y.1993) (noting that "the bankruptcy court [may not] exercise jurisdiction over those issues which, although not themselves on appeal, nevertheless so impact those on appeal as to effectively circumvent the appeal process.").

The TPS Consortium specifically objects to the provisions of the Modified Plan that authorize the transfer of the TPS from the Debtors to JPMC [11] because ownership of the TPS is the subject of the appeal. The TPS Consortium argues that the Modified Plan must recognize the limits of this Court's ability to deal with the TPS by providing that the TPS will be held in escrow until the appeal is resolved.

The Plan Supporters disagree with the TPS Consortium's articulation of the Divestiture Rule as applied in bankruptcy cases. They note that in the bankruptcy context the appeal of one ruling does not mean that the entire bankruptcy case is stayed. The Bankruptcy Rules make this clear by providing that during an appeal, "the bankruptcy judge may suspend or order the continuation of other proceedings in the case under the Code or make any other appropriate order during the pendency of an appeal on such terms as will protect the rights of all parties in interest." Fed. R. Bankr.P. 8005. *See also In re Hagel*, 184 B.R. 793, 798–99 (9th Cir. BAP 1995) (holding that Rule 8005 "does not provide that the bankruptcy court must stay all proceedings" but that it has discretion to stay any proceedings).

The Plan Supporters argue that contrary to the suggestion of the TPS Consortium, absent a stay pending appeal,[12] the lower court may take all actions necessary to implement or enforce the order from which an appeal has been taken. *See, e.g., Hope v. Gen. Fin. Corp. of Ga. (In re Kahihikolo)*, 807 F.2d 1540, 1542–43 (11th Cir.1987) (dismissing appeal as moot because, absent stay pending appeal, the secured lender was free to treat order granting relief from stay as final and sell the

---

11. Specifically, the TPS Consortium argues that the Modified Plan provides that the TPS will be transferred pursuant to section 363 to JPMC, which will be a good faith purchaser and entitled to the protections of section 363(m). (D 255 at §§ 2.1(c)(i) & 38.1(a)(10).) The Modified Plan also provides that the Debtors, JPMC, and the FDIC will be released from any claims related to the TPS which are held by any third party claiming through the Debtors. (*Id.* at §§ 2.1(c), 23.2, 43.2, 43.6, 43.7, 43.9 & 43.12; D 255H at §§ 2.3, 3.2.)

12. The Plan Supporters argue that the logical extension of the TPS Consortium's argument

would effectively be to eliminate the need to ask for (or to comply with the requirements of) a stay pending appeal. They contend that to get a stay pending appeal of the order entered in the TPS Adversary, the TPS Consortium would have to post a supersedeas bond. Fed. R. Bankr.P. 7062. 10 Collier on Bankruptcy ¶ 8005.03 (2011) ("the procedure mandates that an appellant desiring the stay of a [judgment] determining an interest in property should present to the bankruptcy court a supersedeas bond in an amount adequate to protect the appellee").

collateral); *In re VII Holdings Co.*, 362 B.R. 663, 666 n. 3 (Bankr.D.Del.2007) (holding that "absent a stay pending appeal, [the lower court] may retain jurisdiction 'to decide issues and proceedings different from and collateral to those involved in the appeal. . . .' [and] may also 'enforce the order or judgment appealed.'") (citations omitted); *In re Bd. of Dir. of Hopewell Int'l Ins. Ltd.*, 258 B.R. 580, 583 (Bankr.S.D.N.Y.2001) (holding that "a bankruptcy court retains jurisdiction, while an appeal is pending and in the absence of a stay, to enforce the [appealed] order or judgment").

The Court agrees with the Plan Supporters. The TPS Consortium's argument that the Divestiture Rule provides that an appeal divests the bankruptcy court of all jurisdiction over the matter is too broad. As explained by the Court in *Whispering Pines*:

> As courts have noted, however, a bankruptcy case typically raises a myriad of issues, many totally unrelated and unconnected with the issues involved in any given appeal. The application of a broad rule that a bankruptcy court may not consider any request filed while an appeal is pending has the potential to severely hamper a bankruptcy court's ability to administer its cases in a timely manner.

369 B.R. at 758.

■ The correct statement of the Divestiture Rule is that so long as the lower

court is not altering the appealed order, the lower court retains jurisdiction to enforce it. *See, e.g., In re Dardashti*, No. CC–07–1311, 2008 WL 8444787, at *6 (9th Cir. BAP Feb. 12, 2008) (stating that "when there is no stay pending appeal, the bankruptcy court retains jurisdiction to enforce an order that is on appeal, on condition that in doing so, the bankruptcy court does not significantly alter or expand upon the terms of that order."); *Hagel*, 184 B.R. at 798 ("courts have recognized a distinction between acts undertaken to enforce the judgment which are permissible, and acts which expand upon or alter it, which are prohibited.").

The cases on which the TPS Consortium relies do not change this general rule and are easily distinguishable.[13] In *Whispering Pines*, for example, the lower court modified the order that was on appeal (confirmation of the lender's plan that gave the trustee time to sell the property before the lender could foreclose on it) by granting the lender immediate relief from the stay to foreclose. 369 B.R. at 759. In *Bialac*, the bankruptcy court enjoined the secured lender from foreclosing while the order granting the lender relief from the stay to foreclose was on appeal. 694 F.2d at 627. In both instances, the bankruptcy court was not merely enforcing the appealed order but was modifying it.[14] In *Demarco*, the bankruptcy court acknowledged that it should consider confirmation

---

**13.** Most of the cases cited by the TPS Consortium merely stand for the proposition that approval of a settlement is a final order for purposes of appeal or has res judicata effect. *See, e.g., United States v. Kellogg (In re West Tex. Mktg. Corp.)*, 12 F.3d 497, 501 (5th Cir. 1994) (concluding that while bankruptcy court approval of settlement was not a final order because no separate order was entered on the docket other than a dismissal of the adversary, the ruling was entitled to res judicata effect); *SEC v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert*

*Grp., Inc.)*, 960 F.2d 285, 289 (2d Cir.1992) (finding that order approving settlement agreement, which was contingent on later confirmation of a plan, was final for purposes of appeal); *In re Beaulac*, 294 B.R. 815, 818 (1st Cir. BAP 2003) (considering order approving settlement as final for purposes of appeal).

**14.** The other cases cited by the TPS Consortium are also inapplicable. *See, e.g., Griggs*, 459 U.S. at 61, 103 S.Ct. 400 (holding that notice of appeal filed while motion to alter

of the debtor's chapter 13 plan if it did not interfere with the appeal but declined to do so because it found that confirmation might render the appeal moot. 258 B.R. at 36.

Unlike the Court in *Demarco*, the Court declines to exercise its discretion under Rule 8005 not to consider the Modified Plan simply because it might render moot the TPS Consortium's appeal of the decision in the TPS Adversary. The TPS Consortium could have avoided this by seeking a stay pending appeal. To do as the TPS Consortium requests would preclude the Court from dealing with confirmation of any plan of reorganization that implicates the TPS and possibly stall these bankruptcy cases indefinitely.

Further, in considering confirmation of the Modified Plan, the Court is not being asked to modify the order that is on appeal (which held that the Debtors own the TPS). *Wash. Mut.*, 442 B.R. at 305–06. Rather, the Court is being asked to enforce its order by approving the Modified Plan that provides for the transfer or sale of the TPS by the Debtors to JPMC as part of the GSA. Therefore, the Court concludes that it has jurisdiction to consider confirmation of the Modified Plan, including the transfer of the TPS, notwithstanding the pendency of an appeal from its prior order determining that the Debtors own them. *See, e.g., Kahihikolo*, 807 F.2d at 1542–43; *VII Holdings*, 362 B.R. at 666 n. 3; *Bd. of Dir. of Hopewell Int'l*, 258 B.R. at 583.

## III. *DISCUSSION*

### A. *Modifications Made per January 7 Opinion*

The Plan Supporters assert that the Debtors have made corrections to the

Modified Plan to fix all of the deficiencies identified by the Court in its January 7 Opinion. Specifically, they contend that (1) the release, injunction, and exculpation provisions of the Modified Plan now are limited to releases by the Debtors, (2) the release and exculpation language and parties have been changed to reflect only those the Court felt were entitled to be released or exculpated, and (3) the activities related to the LTWs have been excluded from the exculpation provision. *Compare Wash. Mut.*, 442 B.R. at 348–56 *with* D 255 at §§ 28.15, 43.5, 43.7, 43.8, 43.9, 43.12.

 The Modified Plan also contains provisions for Court approval of fees to be paid by the Debtors. *Compare* 442 B.R. at 365 *with* D 255 at §§ 3.2, 32.12 & 43.18. The LTW Holders complain, however, that the fees of some of the parties (notably the WMB Noteholders and the Liquidating Trustee) are being paid without Court approval. (D 255 at §§ 21.1, 28.11.) The Court agrees that Court approval of those fees is also required. 11 U.S.C. § 1129(a)(4).

In addition, the Modified Plan provides that late-filed claims will be paid before post-petition interest is paid on unsecured claims. *Compare* 442 B.R. at 357 *with* D 255 at § 16.2 & Ex. G. In the Modified Plan, the Debtors also revised the definition of unsecured claims and provided that if the LTW Holders are determined to hold allowed unsecured claims that are not subordinated under section 510, then they will be treated in Class 12. *Compare* 442 B.R. at 357 *with* D 255 at §§ 1.209 & 25.1. The Debtors also solicited stock elections from the LTW Holders and other disputed

judgment was pending was a nullity); *Venen*, 758 F.2d at 120, 123 (holding that trial court did not have jurisdiction to grant motion for

reconsideration and vacate order that was on appeal).

claims, so that those creditors would have the same rights as others in the event their claims are allowed. *Compare* 442 B.R. at 362 *with* D.I. 7081.

The Debtors did not, however, include in the Modified Plan that smaller PIERS holders would have the same right to participate in the rights offering as the larger PIERS holders. 442 B.R. at 360–61. Instead the rights offering was eliminated. The Debtors explained that this was done because to expand the rights offering to include all PIERS would have resulted in the Reorganized Debtor being a public company, requiring the Debtors to update their filings with the SEC at the cost of millions. (*See* Tr. 2/18/2011 at 80–81.) [15]

■ Finally, the Modified Plan provides that the Equity Committee will have a representative on the Liquidating Trust board and that there will be a mechanism for removal of the Liquidating Trustee. *Compare* 442 B.R. at 364–65 *with* D 255 at §§ 8.2 & 35.2. However, the Modified Plan provides only for removal of the Liquidating Trustee for fraud, misconduct, or breach of fiduciary duty. (D 255 at § 8.2.) The Court believes that the Liquidating Trustee must be removable at the discretion of a majority of the Trust Advisory Board. In addition, the composition of the Trust Advisory Board must reflect the constituents who hold Liquidating Trust Interests. When creditors are paid in full, their Liquidating Trust Interests will be canceled and preferred shareholders will be issued Liquidating Trust Interests. (Tr. 7/13/2011 at 98; D 255 at §§ 6.3, 7.3, 16.3, 18.3, 19.3, 20.3, 22.1, 22.2, 23.1 & 24.1.) Consequently, the Trust must provide that when creditors lost their Liquidating Trust Interests, the creditors' representatives on the Board will be replaced by representatives selected by equity.

### B. Reasonableness of the GSA

■ In the January 7 Opinion, the Court concluded that the GSA was reasonable. 442 B.R. at 345. After reviewing all of the claims being resolved in the GSA, the Court was not convinced that the Debtors had a probability of achieving a significantly better result if they were to continue to litigate than they will receive under the GSA considering the claims separately or holistically. *Id.* at 344. The Court further concluded that it is not possible to say that any judgment against JPMC or the FDIC would not face difficulty in collection, especially if it is in the billions of dollars as the Plan Objectors contend. *Id.* In particular, the Court found that the significant counterclaims raised by JPMC and the FDIC against the Debtors (in excess of $54 billion) added to the difficulties of collecting from them. *Id.* The Court also concluded that the complexity of the various litigation and its interrelatedness, favored a settlement. *Id.* at 345.

The Plan Supporters contend that the January 7 Opinion is the law of the case and may not be altered in the absence of an intervening change in the law or new evidence. *See, e.g., Hayman Cash Register Co. v. Sarokin,* 669 F.2d 162, 169 (3d Cir.1982); *In re AmeriServe Food Distrib., Inc.,* 315 B.R. 24, 36 (Bankr.D.Del. 2004). They contend that no new evidence or intervening change in the law has been presented which merits reconsidering the Court's conclusion that the GSA is reasonable.

---

**15.** It appears, nonetheless, that because stock is being issued to creditors under the Modified Plan, the Reorganized Debtor may be a public company. The Debtors have now changed their position and contend that they will not be required to update their filings with the SEC. *See infra* Part F.

The TPS Consortium disagrees. It contends that the Court's January 7 Opinion was not a final order on this issue because the Court denied confirmation rather than granting it. *See, e.g., Gander Mountain Co. v. Cabela's, Inc.*, 540 F.3d 827, 830 (8th Cir.2008) (holding that "[a] district court's comments during oral argument do not constitute a final order subject to the law-of-the-case doctrine"); *Cable v. Millennium Digital Media Sys., L.L.C. (In re Broadstripe, L.L.C.)*, 435 B.R. 245, 256 (Bankr.D.Del.2010) (holding that ruling by state court on motion to expedite proceeding was not law of the case on the merits of the claim).

The Court finds the TPS Consortium's cases distinguishable and agrees with the Plan Supporters that its ruling on the reasonableness of the GSA rendered as part of the January 7 Opinion is law of the case because it decided a disputed issue. *Cf. Drexel Burnham*, 960 F.2d at 289 (finding that order approving settlement agreement, which was contingent on later confirmation of a plan, was final for purposes of appeal). The Equity Committee agreed that the January 7 Opinion's ruling on reasonableness of the GSA would not be retried. (Tr. 1/20/11 at 51–52.) The Equity Committee does argue, however, that intervening events have occurred which require reconsideration of this Court's decision that the GSA is reasonable.

### 1. *Business tort claims*

On February 16, 2009, certain holders of WMI common stock and debt securities issued by WMI and WMB [16] filed the ANICO Litigation against JPMC in state court in Galveston County, Texas, alleging misconduct by JPMC in connection with the seizure of WMB and the P & A Agreement. (D.I. 6083 at ¶ 23.) On

March 25, 2009, the ANICO Litigation was removed and transferred to the DC Court on motion of JPMC and the FDIC Receiver as intervening defendant. (*Id.* at ¶ 24.) On April 13, 2010, the DC Court dismissed the ANICO Litigation finding that under the Financial Institutions Reform Recovery and Enforcement Act of 1989 ("FIRREA"), the receivership was the exclusive claims process for claims relating to the sale of WMB. *Am. Nat. Ins. Co. v. JPMorgan Chase & Co.*, 705 F.Supp.2d 17, 21 (D.D.C.2010).

That order was recently reversed on June 24, 2011, by the Court of Appeals for the D.C. Circuit. *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1142 (D.C.Cir.2011) (holding that because the "suit is against a third-party bank for its own wrongdoing, not against the depository institution for which the FDIC is receiver (i.e., Washington Mutual), their suit is not a claim within the meaning of [FIRREA] and thus is not barred") (citing *Rosa v. Resolution Trust Corp.*, 938 F.2d 383, 394 (3d Cir.1991) (holding that claims for damages against assuming bank for its own acts did not fall within jurisdictional bar because they did not seek payment from assets of the receiver)). As a result, the Plan Objectors contend that the business tort claims which the Debtors have against JPMC are not barred and are potentially valuable assets which are being released for no consideration under the GSA.

The Court disagrees. Despite the recent ANICO decision, the likelihood of success on the Debtors' business tort claims, the delay and cost of pursuing them, their complexity, and the possible difficulties of collecting all militate in favor of approval of the GSA. *See, e.g., TMT Trailer Ferry*,

---

**16.** Since the suit was filed, all claims based on WMI stock or debt have been voluntarily dismissed and the ANICO Plaintiffs currently assert rights only as WMB bondholders. *Am. Nat'l Ins. Co. v. FDIC,* 642 F.3d 1137, 1140 (D.C.Cir.2011).

390 U.S. at 424, 88 S.Ct. 1157; *In re RFE Indus., Inc.*, 283 F.3d 159, 165 (3d Cir. 2002); *Martin*, 91 F.3d at 393.

With respect to the first factor, even the D.C. Circuit acknowledged that there were "knotty questions" left to be decided in the case, including whether the claims belonged exclusively to the FDIC as the receiver of WMB.[17] *Am. Nat'l Ins.*, 642 F.3d at 1145. The FDIC Receiver further argues that the Debtors did not file any claim in the Receivership action based on the alleged business tort claims and those claims are, therefore, time-barred. *Cf.* 12 U.S.C. § 1464(d)(2)(B) (any claims challenging the appointment of the FDIC as Receiver must be brought against the OTS within 30 days of the appointment).

Even if the Debtors do have an independent business tort claim against JPMC, however, they still face significant obstacles in successfully prosecuting it. Any claim for damages would require that the Debtors prove that they were solvent[18] at the time of the seizure of WMB, a position diametrically opposed to assertions they would need to prove in the preference and fraudulent conveyance claims which are also waived as part of the GSA. The Debtors would also have to establish the facts necessary to win those claims, namely that JPMC fraudulently caused the decline in value of WMB in order to buy it at a discount price.

Further, the difficulties in collecting any judgment against JPMC have not changed since the Court's January 7 Opinion. The GSA resolves not only the Debtors' business tort claims but the many disputed claims which involve a multiplicity of issues raising complex arguments about the intersection of bankruptcy law and the regulation of banks. The Supreme Court's recent decision in *Stern v. Marshall* also makes it likely that, in the absence of a global settlement, the various claims would have to be litigated in numerous state and federal courts, which might result in conflicting decisions. Continuing the litigation on the disputed claims will cause at least a 3–4 year delay in any distribution to creditors, increase post-petition interest and professional fees (which are currently running at the monthly rate of $30 million and $10 million, respectively), and involve complex issues including sovereign immunity (affecting even whether discovery could be taken of the government agents), pre-emption, and jurisdiction.

Given all these factors, the fact that one part of the GSA is now more unsettled than it was does not change the Court's mind about the overall reasonableness of the GSA. In fact, it reinforces the Court's belief that this is precisely the type of multi-faceted, multi-district litigation that calls for a global settlement. The Court, therefore, reaffirms its conclusion that the

---

17. JPMC and the FDIC Receiver contend that any derivative claim that WMI may have for alleged harm to WMB is now owned by the FDIC. 12 U.S.C. § 1821(d)(2)(A)(i) (providing that the FDIC as receiver "succeeds to all rights, titles, powers, and privileges of . . . any stockholder" of the bank). *See also Pareto v. F.D.I.C.*, 139 F.3d 696, 700 (9th Cir.1998) (holding that § 1821(d)(2)(A)(i) vests in the FDIC all rights and powers of a stockholder of a bank to bring a derivative action).

18. The TPS Consortium asks the Court to consider a summary of and excerpts from the Senate Report issued after an investigation into the WMB collapse, which it contends shows that the Debtors have viable claims against their directors and officers. That Report, however, also noted that the market value of the Debtors was based on misinformation, suggesting that the Debtors might have been insolvent. (D.I. 8312 at Ex. A p. 4.) This would defeat any claim that the Debtors might have on the business tort claims, because the Debtors would have suffered no damages.

GSA provides a reasonable resolution in light of the possible results of the multiple complex litigation, the likely difficulties in collection, the expense inherent in any further delay, and the paramount interests of the stakeholders. 442 B.R. at 345.

### 2. Other objections to reasonableness

Many of the individual shareholders who object to confirmation of the Modified Plan do so based on the assertion that the GSA should not be approved. Some of the objections are based on alleged facts for which no evidence was presented at the confirmation hearings.[19] Those objections must fail for lack of support in the record.

Many of the individual objectors also repeat arguments presented at the confirmation hearing in December which the Court already addressed in its January 7 Opinion. Absent changed facts or law, the Court will not reconsider that decision. See, e.g., Hayman, 669 F.2d at 169; AmeriServe, 315 B.R. at 36.

■■■ The individual objectors do, however, refer to some issues that the Court can consider. Specifically, they reference some recent decisional law that they say the Court should consider in determining reasonableness.

### a. Colonial BancGroup decision

The first was a decision in the Colonial BancGroup case in which the Court found that the FDIC did not have the right to set off claims it had against deposits that the debtor had in its former subsidiary bank that had been seized and sold to another bank. In re The Colonial BancGroup, Inc., Bankr.No. 09–32303, 2011 WL 239201, at *9 (Bankr.M.D.Ala. Jan. 24, 2011). This, they argue, means that the Debtors would have won the fight

over who had title to the deposit accounts in WMI's name at WMB.

The Court does not find, however, that the Colonial BancGroup decision alters its conclusion on the reasonableness of the GSA for two reasons. First, that decision did not deal with the claim by the acquiring bank to the deposit accounts but only dealt with the FDIC claim. Id. Second, the Court already concluded in the January 7 Opinion that the Debtors had a strong likelihood of success on the merits on their claim of ownership to the deposit accounts. 442 B.R. at 331. The Colonial BancGroup decision merely reinforces that conclusion.

### b. Team Financial decision

The individual objectors also refer the Court to the decision in Team Financial in which the Bankruptcy Court held that the debtor, not the FDIC, owned a tax refund received by the debtor for its consolidated tax group which included a bank for which the FDIC was the receiver. In re Team Fin., Inc., Bankr.No. 09–10925, 2010 WL 1730681, at *10 (Bankr.D.Kan. Apr.27, 2010). The Team Financial Court held that the FDIC was limited to a pre-petition breach of contract claim under the group's tax sharing agreement. Id. at *11.

Again, the Court finds that decision is insufficient to change its mind about the reasonableness of the GSA. In the January 7 Opinion the Court concluded that the Debtors had a fair likelihood of prevailing on the issue of who owned the tax refunds. 442 B.R. at 333. The Court noted, however, that the FDIC asserted a claim under the Tax Sharing Agreement between WMI and WMB to the portion of the tax refund which related to WMB's operating losses. Id. Because the estate is solvent and unse-

---

19. These include allegations about the value that JPMC received in acquiring WMB. (D.I. 8407, 8408.)

cured creditors are likely to get paid in full, the Court found that the FDIC's claim would entitle it to a substantial recovery and, therefore, the Debtors were not likely to obtain a net recovery which is substantially better than the GSA by litigating that issue. *Id.*

### c. *Deutsche Bank National Trust Co. decision*

The Court is also aware that the DC Court recently denied a motion of the FDIC to dismiss a complaint against it which raised business tort claims arguably similar to the ANICO claims. *Deutsche Bank Nat'l Trust Co. v. FDIC,* 1:09–cv–01656 (D.D.C. Aug. 17, 2011). The Court does not consider this relevant to its consideration of the merits of any claims that the estate may have against the FDIC in this case, however, as the order was not a decision on the merits.

For all the above reasons, the Court concludes that there is not any intervening change in the law or facts to cause it to reconsider its conclusion in the January 7 Opinion that the GSA is reasonable.

### C. *Value Distributed Under the Modified Plan*

Pursuant to the Modified Plan, stock in WMI will be canceled and stock in reorganized WMI (the "Reorganized Debtor") will be issued to creditors who elect to receive stock in lieu of cash payments or interests in the Liquidating Trust, as well as to PIERS for that portion of their claims that are not paid in cash or Liquidating Trust Interests. (Tr. 7/13/2011 at 97–98; D 255 at §§ 6.2, 7.2, 16.2, 18.2, 19.2, 20.2 & 22.2.) The Reorganized Debtor will be vested with miscellaneous assets, the most valuable of which is the stock of a subsidiary of WMI, WM Mortgage Reinsurance Company ("WMMRC"). (Tr. 7/13/2011 at 97–98, 248.) The value of the Reorganized Debtor also includes certain tax attributes, namely net operating losses ("NOLs"). The Debtors' NOLs (including WMB in its tax group) amount to an estimated $17.7 billion in face value for pre-2011 losses, assuming an Effective Date of the Plan of August 31, 2011. (D Demo 1; Tr. 7/13/2011 at 102–03.) The use of the NOLs, however, is subject to the limitations of section 382 of the Internal Revenue Code (the "Tax Code").

The Reorganized Debtor will not be vested with any claims (including claims against directors and officers) of the Debtors. Instead, those claims are vested in the Liquidating Trust, interests in which are being distributed to certain creditor classes. (D 255 at §§ 6.1, 7.1, 16.1, 18.1, 19.1, 20.1, 21.1, 28.3 & 32.1(b).)

According to the stock election results, stock in the Reorganized Debtor will be held as follows: 24 million shares by Senior Noteholders, 13 million shares by Senior Subordinated Noteholders, and 123 million shares by PIERS holders. (D.I. 8108 at 32; Tr. 7/13/2011 at 101.) The shares will be issued at a rate of one share for each dollar of claim exchanged. (D 255 at § 1.167.) Based on the Debtors' valuation of the Reorganized Debtor, the stock, cash, and interests in the Liquidating Trust to be distributed to creditors will result in all creditor classes being paid in full, with the exception of the lowest class, the PIERS. Therefore, the Modified Plan anticipates that there will be no distribution to any shareholders and their interests will be canceled. (D 255 at §§ 23.2, 24.2, 25.1 & 26.1.) In the event that all the creditors do get paid in full, however, Liquidating Trust Interests will be redistributed to the preferred shareholders. (Tr. 7/13/2011 at 98; D 255 at §§ 6.3, 7.3, 16.3, 18.3, 19.3, 20.3, 22.1, 22.2, 23.1 & 24.1.)

The Plan Objectors contend, however, that the Reorganized Debtor has substantial value in excess of the claims of the

creditors that are receiving its stock. The stock in the Reorganized Debtor is not being distributed to anyone other than the creditors. (Tr. 7/13/2011 at 101.) Therefore, the Plan Objectors argue that those creditors are getting more than the amount of their claims in violation of section 1129(b). *See, e.g., In re Exide Techs.,* 303 B.R. 48, 61 (Bankr.D.Del.2003) (holding that section 1129(b) prohibits creditors from receiving more than the full value of their claims before junior classes receive a distribution). Instead, the Plan Objectors argue that the excess value should be given to the other stakeholders, notably the preferred and common shareholders.

The Plan Supporters and the Plan Objectors each presented valuation experts in support of their positions.

### 1. *Daubert Motion*

The Debtors filed a motion to exclude the testimony of both of the Equity Committee's experts: Peter Maxwell, the valuation expert, and Kevin Anderson, the tax expert. The Debtors argue that Maxwell's opinion is not based on accepted methodologies and is based on hypothetical scenarios that have no relevance to this case (namely, that the Reorganized Debtor will raise substantial amounts of debt and equity to develop or acquire additional business in order to utilize more of the NOLs). *See, e.g., Neb. Plastics, Inc. v. Holland Colors Ams., Inc.,* 408 F.3d 410, 416–17 (8th Cir.2005) (although factual basis of expert opinion generally goes to credibility, if the opinion is "so fundamentally unsupported" because it fails to consider relevant facts, then it can offer no assistance to the trier of fact and must be excluded); *Guillory v. Domtar Indus., Inc.,* 95 F.3d 1320, 1331 (5th Cir.1996) (expert testimony was properly excluded where it was not based upon facts in the record but on altered facts and speculation designed to bolster a party's position); *Boucher v. U.S.*

*Suzuki Motor Corp.,* 73 F.3d 18, 21 (2d Cir.1996) (expert testimony should be excluded "if it is speculative or conjectural or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith"); *McMillan v. Weeks Marine, Inc.,* 478 F.Supp.2d 651, 657–59 (D.Del. 2007) (excluding expert testimony as speculative because it was based on unrealistic assumptions); *In re Nellson Nutraceutical, Inc.,* 356 B.R. 364, 373 (Bankr.D.Del. 2006) ("[I]f the factual basis of an expert's opinion is so fundamentally unsupported because the expert fully relies on altered facts and speculation, or fails to consider relevant facts in reaching a conclusion, the expert's opinion can offer no assistance to the trier of fact, and is not admissible on relevance grounds."); *In re Gretz,* Bankr. No. 09–10069, 2011 WL 1048635, at *4 (Bankr.D.Del. Mar. 18, 2011) (rejecting a valuation hypothesizing that an unrenovated property with no rental income was a fully-renovated income-producing property because it was "simply too far removed from the facts on the ground for the Court to be able to confidently rely upon it.").

The Equity Committee responded that even the Debtor's own expert, Steven Zelin, considered and valued the Reorganized Debtor's "corporate opportunity" to acquire or develop new business. It argues that this type of disagreement does not warrant excluding one expert's opinion but merely goes to the credibility of the witnesses. The Equity Committee contends that the Court's gatekeeper function under Rule 702 of the Federal Rules of Evidence and *Daubert* is "not a substitute for testing the assumptions underlying the expert witness' testimony on cross-examination." *Lichtenstein v. Anderson (In re Eastern Continuous Forms, Inc.),* No. Civ. A. 04–629, 2004 WL 2418285, at *4 (E.D.Pa. Oct. 28, 2004). "A party confronted with an adverse expert witness who has sufficient,

though perhaps not overwhelming, facts and assumptions as the basis for his opinion can highlight those weaknesses through effective cross-examination." *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir.2002). The Equity Committee argues that Rule 702 establishes a "liberal policy of admitting expert testimony which will 'probably aid' the trier of fact." *Knight v. Otis Elevator Co.*, 596 F.2d 84, 87 (3d Cir.1979) (quoting *Universal Athletic Sales Co. v. Am. Gym, Recreational & Athletic Equip. Co.*, 546 F.2d 530, 537 (3d Cir.1976)). Accordingly, the Equity Committee asserts that "doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility." *In re Japanese Elec. Prods.*, 723 F.2d 238, 278 (3d Cir. 1983), *rev'd on other grounds*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

 To admit an expert's testimony under Rule 702 of the Federal Rules of Evidence, courts must focus on "the trilogy of restrictions on expert testimony: qualification, reliability and fit." *Calhoun v. Yamaha Motor Corp.*, 350 F.3d 316, 321 (3d Cir.2003). The first element considers the qualifications of the proposed expert in the field in which he is to testify, i.e., his "knowledge, skills, and training." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir.1994). The second element considers several factors:

(1) whether a method consists of a testable hypothesis;

(2) whether the method has been subject to peer review;

(3) the known or potential rate of error;

(4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testi-

fying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Id.* at 742 n. 8. The third element requires that the "evidence must first be relevant to be admissible. Relevant evidence is evidence that helps the trier of fact to understand the evidence or to determine a fact in issue." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 n. 12 (3d Cir.2000).

 The Court heard argument and reserved judgment on the *Daubert* motion until the testimony was presented and cross-examination completed, in order to have a better idea of the bases for the experts' qualifications and opinions. After considering that testimony, the Court concludes that the testimony of Maxwell should not be excluded because, although he did not follow normal methodologies for valuing a business, his report was not a valuation of the Reorganized Debtor but simply a critique of the valuation done by the Debtors' expert. To that extent it is helpful to the Court. With respect to the argument that Maxwell's opinion is based on hypothetical scenarios that have no basis in the record, the Court is able to evaluate and consider the likelihood of the occurrence of the various scenarios on which Maxwell relies in considering the credibility of his testimony about the value of the Reorganized Debtor.

 The Debtors also argue that Anderson is not an expert in the field on which he is asked to opine, namely the likelihood that the IRS will use section 269 of the Tax Code to disallow some or all of the NOLs. The Debtors specifically note that Anderson had no experience with cases in which section 269 was a major consideration. (Tr. 7/13/2011 at 132–35.) In addition, the Debtors seek to exclude Anderson's opinion as an impermissible legal opinion. *See, e.g., Berckeley Inv. Grp.,*

*Ltd. v. Colkitt,* 455 F.3d 195, 217 (3d Cir. 2006) ("Although Federal Rule of Evidence 704 permits an expert witness to give expert testimony that 'embraces an ultimate issue to be decided by the trier of fact,' an expert witness is prohibited from rendering a legal opinion.").

With respect to the first issue, the Court found Anderson to be an expert in tax issues relevant to the acquisition and merger of corporations, particularly troubled companies. (Tr. 7/13/2011 at 127–29, 135.) Although the Debtors contend that he is not an expert on section 269 of the Tax Code, the Court finds that too narrow of an area of expertise to expect. Anderson testified that in rendering advice on mergers and acquisitions involving NOLs, he considered section 269, as well as section 382, because the two were both implicated. (*Id.* at 128–29, 132–35.) Thus, although he never issued a "pure" section 269 opinion, he always considered its effect. (*Id.*) Consequently, the Court finds that Anderson had sufficient experience with the applicability of section 269 of the Tax Code to render an opinion.

██ With respect to the second factor, the Court is not being asked to render a decision on the legal issue of whether the use of the NOLs by the Reorganized Debtor will be challenged (and if challenged, will be disallowed). Instead, the issue before the Court is what is the value of the NOLs to the Reorganized Debtor and its stakeholders. This requires not simply a determination of the legal effect of section 269 but also the possibility that it would be invoked under various scenarios which may occur in the future. The Court finds that Anderson's opinion on this issue is helpful to its ultimate determination of those possibilities and their effect on the value of the NOLs. Therefore, the Court will not exclude Anderson's testimony.

## 2. *Value of WMMRC*

### a. *Value of existing business*

WMMRC is a captive reinsurance company which wrote policies on mortgage loans issued by WMB and other affiliates of the Debtors. (Tr. 7/13/2011 at 97–98, 252.) Since the seizure of WMB, WMMRC has been in run-off: it has not issued any new policies and is simply collecting premiums and paying claims on the existing policies. (*Id.* at 97–98, 251–52.) WMMRC has no independent management, no independent sales force, and no employees. (*Id.* at 251.)

The Debtors' valuation expert, Zelin, testified that in his opinion the value of WMMRC was between $115 and $140 million. (*Id.* at 260; D 341 at 8.) This was based on the Debtors' business and actuarial projections for the run-off of WMMRC's current policies through 2019 (when they will expire). (Tr. 7/13/2011 at 251–59, 262, 277–82; D 340.) Zelin assumed that the Reorganized Debtor would have no other business and that the income generated from the run-off of WMMRC's business would be paid in dividends to investors rather than used to make acquisitions or build new business. (Tr. 7/13/2011 at 308–09.)

The Equity Committee does not disagree with the Debtors' valuation of the existing WMMRC run-off business. In fact, its expert, Maxwell, opined that the value of WMMRC in run-off was in the same range as Zelin's, $129 to $135 million. (Tr. 7/15/2011 at 68–70, 120.)

The only valuation of WMMRC which was done using accepted valuation methodologies was that done by Zelin. The Court recognizes, however, the inclinations of debtors to undervalue themselves and plan objectors to overvalue the company to support their arguments. *See, e.g., Exide,* 303 B.R. at 61 ("The Creditors Committee ar-

gues that the Debtor's expert has undervalued the company and that the Plan will result in paying the Prepetition Lenders more than 100% of their claims to the detriment of the unsecured creditors. The Debtor, on the other hand, argues that the Creditors Committee's expert has overvalued the company and that the Plan is fair and equitable in its treatment of unsecured creditors."). In addition, the Court agrees that there are some flaws in Zelin's analysis.[20] The Court, therefore, finds that the value of the existing business of WMMRC (assuming no new business is generated or acquisitions are made) is at the high end of Zelin's range of value, or $140 million.

### b. *Value of the NOLs*

Although the face amount of the Debtors' NOLs is estimated to be $17.7 billion for pre–2011 losses, the value of the NOLs is limited by several factors. (D Demo 1; Tr. 7/13/2011 at 102–03.) First, section 382 of the Tax Code will limit the Reorganized Debtor's ability to use the NOLs, because under the terms of the Modified Plan there will be a change in ownership of WMI (from the current shareholders to the creditors). (Tr. 7/13/2011 at 102–03, 141–42, 162; D 367 at 4–5.)

A large part of that NOLs will also be lost once WMB ceases to be a member of the tax group, because the bulk of the losses were attributable to WMB's operations. (Tr. 7/13/2011 at 102–03, 162–63.) WMB will cease being a member of the Debtors' tax group upon conclusion of the FDIC's receivership. (*Id.* at 104–05.) Therefore, the Debtors have filed a motion for authority to abandon the stock of WMB before the Effective Date of the Modified Plan, which will result in a $6 billion NOL for 2011 if the Modified Plan is confirmed.[21] (*Id.* at 106, 164–65; D 368 at 4–5.) The portion of the tax loss for 2011 which occurs before the Effective Date is subject to the limitations of section 382 of the Tax Code; the portion after the Effective Date is not. (Tr. 7/13/2011 at 105, 108.) Assuming an Effective Date of August 31, 2011, the Debtors projected a limited NOL of $4 billion and an unlimited NOL of approximately $2 billion for the 2011 losses.[22] (*Id.* at 109–10, 163–64; D 368 at 4–5.) The Equity Committee's expert, Anderson, agreed with the Debtors' decision to take a worthless stock deduc-

---

**20.** Maxwell highlighted some internal inconsistencies and problems with Zelin's analysis: Zelin used the weighted average cost of capital ("WACC") figure from his December 2010 report, although that number has fallen since then by 5 to 10 percentage points, which would have increased the value (Tr. 7/13/2011 at 314–17; Tr. 7/15/2011 at 58); he used a WACC of 13–15% although historical returns on equity for similar businesses are 8 to 12.5% and current returns for insurance companies are 6 to 10% (Tr. 7/13/2011 at 324–32); he gave little weight to the value of precedent transactions (which yielded a value of $145 to $205 million) and accorded most weight to the discounted cash flow analysis (*id.* at 310–11; D 341 at 13, 23).

**21.** The Debtors filed a certificate of no objection to the motion, causing the Court to grant it by order dated July 8, 2011. (D.I. 8104.)

At a status hearing held on August 12, 2011, the Debtors advised that they had withdrawn the certificate of no objection late on the evening of July 5, 2011, when they were advised by the Equity Committee that individual shareholders objected to the motion. (Tr. 8/12/2011 at 15.) However, after reviewing the docket the Debtors were unable to identify any objection to the motion. At the status hearing the Equity Committee advised that it had no objection to the motion, so long as the Debtors did not abandon the stock until after a plan was confirmed. The Debtors agreed and a form of order to that effect was to be filed with the Court. (*Id.* at 21.)

**22.** The later in the year that the Effective Date occurs, the smaller the amount of the unlimited NOL. (Tr. 7/13/2011 at 107–10, 161; D Demo 2.)

tion for the WMB stock. (Tr. 7/13/2011 at 164–65.)

### i. *NOLs used by run-off business*

Zelin did attempt to determine the net present value of the NOLs in two components. The first was the value of the NOLs to existing WMMRC if it simply remains in run-off. Based on his valuation of the Reorganized Debtor, Zelin testified that under section 382 the portion of the NOLs which could be used by WMMRC during run-off was approximately $7 million per year. (D Demo 1; Tr. 7/13/2011 at 103–04.) According to Zelin, the present value of the NOLs that could be used by WMMRC is $10 to $20 million. (Tr. 7/13/2011 at 260–61, 275–78, 284–85; D 341 at 8.)

The Plan Objectors do not really dispute this value; they contend only that it is based on WMMRC's current operations and does not take into account the possible future revenues that could be generated. *See, e.g., Consol. Rock Prods. Co. v. Du Bois*, 312 U.S. 510, 526, 61 S.Ct. 675, 85 L.Ed. 982 (1941) (in valuing company court must consider "all facts relevant to future earning capacity and hence to present worth").

Because Maxwell did not do a valuation of the existing business with its NOLs, the Court accepts that the value of the NOLs to the existing WMMRC business is that

determined by Zelin or $20 million. (Tr. 7/15/2011 at 36–37.)

### ii. *NOLs used by future business*

Zelin also attempted to value the NOLs that might be able to be used in the event of a future acquisition of a profitable business by WMMRC, which he valued at an additional $10 to $25 million. (Tr. 7/13/2011 at 260–61, 275–78, 284–85; D 341 at 8.)

The Plan Objectors argue that the principal defect [23] in Zelin's valuation is that he values the Reorganized Debtor as a liquidating company (rather than as a going concern) and fails to attribute sufficient value to the ability of the Reorganized Debtor to generate new business itself or to use the NOLs through the acquisition of profitable businesses. (Tr. 7/15/2011 at 38.) The Equity Committee's expert, Maxwell, opined that, assuming an initial capital infusion of $140 million, debt of $200 million, and a subsequent second tranche of debt of $160 million, the Reorganized Debtor could have a value (based on a net present value calculation) of $275 million. (*Id.* at 39–50; EC 154 at 7–8, 11.) He also opined that the value could increase with subsequent equity raises or other merger/acquisition opportunities.[24] (Tr. 7/15/2011 at 50–51.)

The Plan Supporters disagree with Maxwell's conclusion and assert that there are many flaws in his analysis.[25] Their pri-

---

**23.** The Equity Committee also had more technical criticisms of this part of the Zelin report: Zelin used a WACC for the future acquisition of 25 to 35%, because it was an unknown, but then did an additional downward adjustment of 33% to reflect the probability that the acquisition will not be effective on day one but will take time to occur. (Tr. 7/13/2011 at 332–34; D 341 at 37.) Maxwell characterized this as double-discounting resulting in an effective rate of 38 to 52% when the correct rate should be 15.8 to 20%. (Tr. 7/15/2011 at 55–56.)

**24.** Maxwell opined that it is possible that the Reorganized Debtor could have additional value of $240 to $420 million but that is premised on raising billions of dollars in additional equity to generate hundreds of millions of dollars in additional income to use the NOLs. (Tr. 7/15/2011 at 84–86; EC 154 at 8.) The Court finds that assumption purely speculative and unrealistic.

**25.** The Debtors' technical criticisms of the Maxwell report included: Maxwell's comparables for the debt to equity ratios were not reinsurance companies (Tr. 7/15/2011 at 91);

mary criticism is that Maxwell did not use typical methodologies to do a conventional valuation of the Reorganized Debtor. (*Id.* at 71–73.) Maxwell admitted this but stated that he was just showing what the possible values are that could be achieved by the Reorganized Debtor if new money was invested or borrowed. The Equity Committee argues that this is not just speculation but was, in fact, what the Settlement Noteholders were expecting to do as evidenced by numerous analyses they performed. (EC 132 & 138.)

The Plan Supporters also contend that Maxwell's assumption that WMMRC will operate as a going concern is faulty. It is not based on the current Modified Plan, any existing business plan, or the known intentions of the future shareholders. (Tr. 7/15/2011 at 74–75, 119.) The Plan Objectors argue that the Debtors have intentionally not done a business plan for WMMRC so that the true value of the Reorganized Debtor as a going concern could not be evaluated. The Plan Supporters respond that it would be presumptuous of the Debtors to prepare a business plan for the Reorganized Debtor and that it will be up to the new owners to decide how it will be run.

Maxwell admitted that to achieve his going concern value, the Reorganized Debtor would have to get new management, hire employees, develop a business plan, get customers and vendors, and acquire hard assets, none of which it currently has. (*Id.* at 75–79, 118.) Maxwell could not give an opinion on whether the Reorganized Debtor could raise the equity or debt needed to realize the values he attributes to the Reorganized Debtor. (*Id.* at

98.) He admitted he did not know of anyone willing to lend or invest in the Reorganized Debtor and stated that his report was just one of a number of possible future scenarios. (*Id.* at 82–84, 88–89; EC 135.) He was also aware that only one third of the rights offering had been subscribed in the Sixth Amended Plan and the Modified Plan does not even have a rights offering. (Tr. 7/15/2011 at 90.) Further, Maxwell does not account for any costs or risks associated with the scenarios he posits. (Tr. 7/13/2011 at 297.) Although Maxwell stated that the cost of equity and debt takes into account some of those risks, he admitted that it did not include the costs and risks of converting a liquidating company with no employees or business into a going concern. (Tr. 7/15/2011 at 149–52.) In addition, Maxwell assumed that the future acquisition will be fully implemented on day one (generating $37 million in income, net of interest expense) but admitted that is not realistic and there would necessarily be time delays before any additional revenue could be generated. (*Id.* at 79–81, 100–01, 124, 126.)

The Court agrees with the Plan Supporters that these are all serious flaws in Maxwell's analysis, which precludes the Court from concluding (as Maxwell opines) that the Reorganized Debtor could have a value in excess of $275 million. However, the Court agrees with Maxwell's critique of Zelin's report that it gives too little value to the possible future earning capacity of the Reorganized Debtor that could be achieved simply by operating as a going concern or merging with a viable company. *See, e.g., Consol. Rock,* 312 U.S. at 526, 61 S.Ct. 675.

---

Maxwell's cost of debt was based on double B rated securities though none of the reinsurance comparables have that good a rating (*id.*); his rate of return is based on going-concern reinsurance companies, not startups or run-offs (*id.* at 92); Maxwell gave 40% weight to precedent transactions, because he erroneously thought Zelin did, although he normally would not give that much weight to them (*id.* at 131–32).

### (1) *Risk of Loss*

The parties also disagree about the effect of the Tax Code on the ability of the Reorganized Debtor to use the NOLs. The Plan Supporters contend that Maxwell does not account at all for any tax risk. (Tr. 7/13/2011 at 297; Tr. 7/15/2011 at 52–53, 107, 119.) They argue that he ignores the possibility that the IRS will disallow all NOLs under section 269 of the Tax Code. The Plan Objectors, in contrast, contend that Zelin artificially undervalued the Reorganized Debtor because of imaginary tax restrictions.

■ In valuing NOLs, bankruptcy courts must take into account the risk that the NOLs will be disallowed. *See, e.g., In re Jartran, Inc.,* 44 B.R. 331, 380 (Bankr. N.D.Ill.1984) (holding that "the realization of the tax savings [from use of NOLs] is subject to a number of contingencies, including continuation in effect of relevant tax provisions, potential challenge under section 269 of the Internal Revenue Code, and possible recapture of the benefits utilized. Accordingly . . . a substantial discount would be required."). *See generally,* Chaim J. Fortgang & Thomas M. Mayer, *Valuation in Bankruptcy,* 32 UCLA L. Rev. 1061, 1130 (1985) ("Uncertainties in preserving the NOL increase the discount.").

■ Section 269 of the Tax Code states in relevant part that: "If any person or persons acquire . . . control of a corporation, . . . and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax . . . then the Secretary may disallow such deduction, credit, or other allowance." 26 U.S.C. § 269(a)(1). For the principal purpose of a transaction to be tax avoidance, the purpose of tax evasion or avoidance has to be more significant, more important, or more prominent than any other purpose; it can be one of the purposes but not the principal purpose. *See, e.g., Scroll, Inc. v. Comm'r,* 447 F.2d 612, 618 (5th Cir.1971) (noting that the "burden of proof on the taxpayer is not an easy one, and when the disputed tax benefits are so disproportionate to the value of the other asserted advantages, that burden may be practically impossible to sustain"); *U.S. Shelter Corp. v. United States,* 13 Cl.Ct. 606, 620 (Cl.Ct.1987) (in considering what is the primary purpose, the court should aggregate all tax avoidance purposes and compare them to the aggregate business purposes) (citing *Bobsee Corp. v. United States,* 411 F.2d 231, 239 (5th Cir.1969)).

■ The Court in *U.S. Shelter* concluded that tax evasion was not the primary purpose of the acquisition even though the acquiror was aware of and interested in using the NOLs, because it found persuasive the testimony that the principal motivations for doing the deal were the business reasons of acquiring a public company and the specific assets of the acquired company. 13 Cl.Ct. at 622–28. In contrast, the Court in *Scroll* found the principal purpose was tax avoidance where the acquired company was not integrated into the acquiror's business and the tax attributes and value of the tangible assets were significantly more than the price paid. 447 F.2d at 615 n. 4, 618. A finding of tax avoidance can be made even if the change in control was through a foreclosure by a creditor. *See, e.g., The Swiss Colony, Inc. v. Comm'r,* 428 F.2d 49, 54 (7th Cir.1970) (upholding Tax Court conclusion that primary purpose of acquisition was tax avoidance even though taxpayer argued that acquisition was accomplished through foreclosure on stock to protect its position as a creditor).

The Plan Supporters presented a tax expert, Richard Reinhold, a tax partner at Wilkie Farr & Gallagher, who testified

that the transfer of stock under the Modified Plan to the creditors was a change of control that could trigger section 269 disallowance of the NOLs. (Tr. 7/13/2011 at 113.) Reinhold opined that in considering the issue of what the principal purpose of the creditors' election to take stock in lieu of cash under the Modified Plan was, the IRS and courts will consider future events that may shed light on the intent of the creditors. (*Id.* at 200; D 404 at 7 n.15.) Those future events would include any additional acquisitions of other companies by the Reorganized Debtor. (Tr. 7/13/2011 at 197.) Reinhold did not testify that the IRS or courts would be more likely to find that tax avoidance was the principal purpose if the amount of capital raised exceeded the non-tax assets' value; he only said that he could not give an opinion that they would not. (*Id.* at 200–01, 224; D 404 at 4–6.) Reinhold opined, however, that if the amount of capital raised is not more than the value of the non-tax assets of the Reorganized Debtor then "the company has quite a good argument that Section 269 will not be brought into play because the principal purpose for the acquisition of shares would not be considered tax avoidance." (Tr. 7/13/2011 at 200; D 404 at 7–9.)

The Equity Committee's expert, Anderson, opined that it was unlikely that section 269 of the Tax Code would apply (resulting in loss of the NOLs) if the Reorganized Debtor acquired additional businesses, because to disallow the NOLs that future acquisition would have to be for the "primary purpose" of tax avoidance. (Tr. 7/13/2011 at 138; D 367 at 15–20; D 370 at 2–5.) He stated that section 269 is rarely used by the IRS because the newer section 382 is more specific in describing instances where NOLs should be disallowed. (Tr. 7/13/2011 at 184.)

Anderson specifically disagreed with Reinhold's opinion that the Reorganized Debtor could not acquire a company whose value was more than the value of Reorganized Debtor (excluding the NOLs) without running afoul of section 269. (*Id.* at 146–47; D 369 at 3.) Instead, Anderson stated that as long as the acquired business had legitimate substantial operations, its acquisition would not result in a loss of the NOLs. (Tr. 7/13/2011 at 142–47; D 367 at 15–17; D 369 at 3–4.) In addition, Anderson opined that there were specific ways in which the Reorganized Debtor could acquire assets and/or stock in the future that would not implicate section 269. (Tr. 7/13/2011 at 149; D 367 at 15–17; D 369 at 3–4.)

The Debtor's expert, Reinhold, did not disagree with Anderson's conclusion that a subsequent acquisition by the Reorganized Debtor was not likely to cause a problem under section 269 or 382. (Tr. 7/13/2011 at 208–11.) However, he noted that his opinion was not addressing the risk that the IRS will challenge any future transfer of ownership under 269 (as Anderson's was), but whether it will challenge the current transfer of ownership to the creditors under the Modified Plan. (*Id.* at 193, 202–03, 208–11; D 404 at 7–9, D 341 at 36.)

Anderson admitted that section 269 could apply to the transfer of stock under the Modified Plan to the creditors and that in determining "principal purpose" courts look at future actions to discern present intention. (Tr. 7/13/2011 at 166–67.) Anderson still felt, however, that it was unlikely that the IRS (or courts) would find that the principal purpose of the transfer of stock in the Reorganized Debtor under the Modified Plan was tax avoidance or evasion. (*Id.* at 147–48, 151–53.)

In evaluating the two conflicting opinions, the Court finds the opinion of Anderson more convincing. The cases

that apply section 269 are fundamentally different from the case at bench. Those cases deal with taxpayers who acquire a company which has a significant NOL and then merge it with their own business in order to shelter their income. *See, e.g., Scroll,* 447 F.2d at 615 (noting that "[o]ne of the most obvious advantages accruing to [the acquiror] as a result of the merger was the possibility ... of offsetting [the acquired company's] substantial pre-acquisition net operating loss carryover against [the acquiror's] even more substantial post-acquisition profits"); *The Swiss Colony,* 428 F.2d at 52 (tax court had found that "Taxpayer acquired control of [liquidating company] 'for the principal purpose of evading or avoiding Federal income taxes by securing the benefit of net operating loss deductions which it would not otherwise have enjoyed' "); *U.S. Shelter,* 13 Cl. Ct. at 609–10 (noting that section 269 was passed to prevent "the recently developed practice of corporations with large excess profits ... acquiring corporations with current past, or prospective losses or deductions, ... for the purpose of reducing [the acquiror's] income and excess profits taxes.") (citing S.Rep. No. 627, 78th Cong., 1st Sess. 58 (1943)).

In this case, the creditors are acquiring the Reorganized Debtor under the Modified Plan not to shelter their own income or to merge it with a company they own. Instead, they are receiving stock in the Reorganized Debtor simply in repayment of debt owed them. Even the situation in *The Swiss Colony* case is distinguishable. In that case, although the Taxpayer had

acquired the loss company's stock through foreclosure, it then attempted to use that company's NOL to shelter its own profits. 428 F.2d at 52. That is not being done by the acquiring creditors in this case.

In addition, most of the new shareholders will receive their stock in the Reorganized Debtor not by election but by default. (Tr. 7/14/2011 at 96–97; D 255 at §§ 20.1 & 20.2.) In fact, the bulk of the stock is being distributed to the PIERS, not because they elected to receive it but because they are the lowest creditor class.[26] (D 255 at §§ 20.1 & 20.2.) Thus, the Court concludes that the IRS is unlikely to find that the principal reason that the creditors in this case are receiving stock under the Modified Plan is for tax evasion purposes.

The fact that the Settlement Noteholders (who as holders of PIERS will receive the bulk of the stock under the Modified Plan) performed analyses of the value of the NOLs does not alone suggest that tax evasion was their reason for accepting stock instead of a cash distribution. *See, e.g., In re Federated Dep't Stores, Inc.,* 135 B.R. 962, 970 (Bankr.S.D.Ohio 1992) ("Consideration by corporate officials of the tax ramifications of an acquisition is not, by itself, indicative of tax avoidance but is 'simply intelligent business planning.' ") (citation omitted); *VGS Corp. v. Comm'r,* 68 T.C. 563, 596, 1977 WL 3758 (1977) ("Complicated business transactions do not take place in a vacuum and we find this [consideration of loss carryovers or

---

**26.** Under the Debtors' valuation of the Reorganized Debtor, there is nothing available for equity shareholders, so the fact that stock in the Reorganized Debtor is being given to the creditors is in large part mandated by the absolute priority rule. *See, e.g., Case,* 308 U.S. at 115–16, 60 S.Ct. 1 (stating that absolute priority rule requires that shareholders not receive any distribution under a plan until

creditors are paid in full). While the Debtors could have simply liquidated WMMRC and disbursed the proceeds to the creditors rather than the stock, the Debtors stated that the offers they received for WMMRC were too low and that they, therefore, concluded that the creditors would get a higher recovery by allowing WMMRC to finish its runoff. (Tr. 7/14/2011 at 45–47; D 391.)

other tax benefits] to be nothing more than prudent business planning."); *U.S. Shelter*, 13 Cl.Ct. at 625 (holding that "the principal purpose of a transaction does not become tax avoidance merely because the parties were cognizant of and considered the tax consequences."). Further, despite doing those analyzes, three of the Settlement Noteholders testified that they did not elect to take extra stock in lieu of cash distributions. (Tr. 7/18/2011 at 123; Tr. 7/19/2011 at 112–13; Tr. 7/20/2011 at 81.)

In this case given the conservative valuation done by Zelin (which assumes that WMMRC will generate no new business), the Court also finds that the electing creditors' decisions to take stock was likely influenced by a belief that the Debtors undervalued the Reorganized Debtor by viewing it as a liquidating company rather than as a going concern. (Tr. 7/14/2011 at 39–40.) *See, e.g., Exide Techs.*, 303 B.R. at 48, 61 (noting the inclination of debtor to undervalue the reorganized entity).

■■■ Given the various reasons for distribution of stock to creditors under the Modified Plan, the Court concludes that the principal purpose of the transfer of ownership of the Reorganized Debtor under the Modified Plan is not the avoidance of taxes. The Court is cognizant of the fact that its opinion on this point is not binding on the IRS. 26 C.F.R. § 1.269–3(e) ("In determining for purposes of section 269 ... whether an acquisition pursuant to a plan of reorganization in a case under [the Bankruptcy Code] was made for the principal purpose of evasion or avoidance of Federal income tax, ... any determination by a court under 11 U.S.C. § 1129(d) that the principal purpose of the plan is

not avoidance of taxes is not controlling."). *See also In re Hartman Material Handling Sys., Inc.*, 141 B.R. 802, 811–12 (Bankr.S.D.N.Y.1992) (holding that "[a] confirmation ruling that the principal purpose of a plan is not tax avoidance is significantly different from a § 269 ruling because the two rulings are made pursuant to different 'factual frames of reference'" and noting that the bankruptcy court can only consider facts up to the time of its ruling on confirmation while the IRS can consider facts after confirmation until the deduction is taken). Nonetheless, the Court considers it significant that the IRS has not objected to confirmation of the Modified Plan on the basis that its principal purpose is tax avoidance although it clearly could have. 11 U.S.C. § 1129(d).[27]

For purposes of estimating the value of the NOLs, therefore, the Court cannot accept the Debtors' assertion that the Reorganized Debtor could not obtain future investments that are more than the value of its non-tax assets without having the IRS conclude that the acquisition of stock by creditors under the Modified Plan runs afoul of section 269 of the Tax Code.

(2) *Value adjusted for loss*

In determining the value of the NOLs resulting from any future acquisition, Zelin assumed that any capital raised would be no more than the value of the current WMMRC non-tax assets based on section 269. (Tr. 7/13/2011 at 260–61, 275–78, 284; D 341 at 8.) As a result, he concluded that the value of the NOLs resulting from any additional acquisitions was no more than $10 to $25 million. (Tr. 7/13/2011 at 260–61, 275–78, 284.)

---

**27.** If a governmental unit objected and the Court found that the principal purpose was to avoid taxes, the Modified Plan could not be confirmed. 11 U.S.C. § 1129(d) ("Notwithstanding any other provision of this section, on request of a party in interest that is a governmental unit, the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes....").

The Court finds that Zelin's valuation is too low, because it was based on the erroneous assumption that the Reorganized Debtor would be restricted by section 269 of the Tax Code in what capital it could raise in the future. However, as noted above, the Court finds that Maxwell's determinations of value are fraught with problems, including the assumption that the Reorganized Debtor will be able to raise debt and equity instantly, even though the Debtors have not obtained exit financing or any new debt or equity commitments. Maxwell's present value of the NOLs also assumes that the Reorganized Debtor will be able to generate instant cash flow from the new debt and equity that has not even been committed yet. As a result, the Court cannot accept Maxwell's determination that the value of the Reorganized Debtor is $275 million.

Based on the two expert opinions, one of which is too conservative and the other of which is too aggressive, the Court concludes that the present value of the NOLs to the Reorganized Debtor is $50 million. This is based on the Court's conclusion that the Reorganized Debtor should be able to raise additional capital and debt over the next twenty years equal to twice the value of its current assets which will be invested in restarting the reinsurance business of WMMRC or acquiring other related businesses. The Court accepts as credible Maxwell's opinion that the reinsurance market is a prime area for new investment given the recent turmoil in the real estate market.[28]

Based on all of the above, the Court concludes that the value of the Reorganized Debtor and its NOLs is $210 million.

3. *Value of Liquidating Trust Interests*

■ In addition to distributions of cash, certain creditors are receiving interests in the Liquidating Trust. (D 255 at §§ 6.1, 7.1, 16.1, 18.1, 19.1, 20.1, 21.1 & 32.1(b).) The Debtors are transferring to the Liquidating Trust all of their interests in any causes of action the estates have, including potential suits against the Debtors' directors and officers. (*Id.* at §§ 28.3 & 43.5.)

The LTW Holders contend, however, that this major component of value that is being distributed to the creditors has been ignored by the Debtors and must be valued in order for the Court to determine whether the Modified Plan meets the best interests of creditors test under section 1129(a)(7).

The Plan Supporters contend that it is not necessary to value the Liquidating Trust Interests because under the Modified Plan's waterfall provisions, once creditors have received payment in full of their claims, with interest, their Liquidating Trust Interests will be canceled and all further recoveries realized by the Liquidating Trust will flow to the preferred shareholders. (*Id.* at §§ 6.3, 7.3, 16.3, 18.3, 19.3, 20.3, 22.1, 22.2, 23.1 & 24.1; Tr. 7/13/2011 at 98.)

The Court agrees with the Plan Supporters that it is not necessary to determine the precise value of the Liquidating Trust assets because whatever they are worth will be distributed to creditors and then to shareholders in accordance with the priorities of the Code.[29]

---

**28.** Maxwell testified that there would be interest in investing in WMMRC because of the current opportunities in the home insurance industry; he cited as an example that Goldman partners had recently raised $600 mil-

lion to start a new reinsurance business. (Tr. 7/15/2011 at 38, 67, 122.)

**29.** The Court therefore finds it unnecessary to determine what if any value the suits against the Debtors' directors and officers have. (D.I.

D. *Good Faith*

Several Plan Objectors, led by the Equity Committee, complain that the Plan cannot be confirmed because it has not been proposed in good faith as a result of the improper conduct of the Settlement Noteholders. They argue that any prior finding of good faith in the January 7 Opinion should be reconsidered by the Court, based on the newly discovered evidence of the Debtors' and Settlement Noteholders' misconduct. Fed. R. Bankr.P. 9024(b).

### 1. *Conduct of the Settlement Noteholders*

The conduct of the Settlement Noteholders was first raised by a pro se PIERS holder, Mr. Thoma, at the confirmation hearings held in December, 2010. Although Mr. Thoma sought to introduce what he described as evidence of improper trades by the Settlement Noteholders, the Court refused that request as it was hearsay. In its January 7 Opinion denying confirmation, however, the Court stated that it was "reluctant to approve any releases of the Settlement Noteholders" as required by the GSA and Sixth Amended Plan in light of Mr. Thoma's allegations of insider trading by the Settlement Noteholders. *Wash. Mut.*, 442 B.R. at 349. Following denial of confirmation, both the Settlement Noteholders and the Equity Committee engaged in discovery, which the Court limited to what information the Settlement Noteholders received from the Debtors.[30] Evidence regarding the conduct of the Settlement Noteholders during the bankruptcy case was presented over the course of four days during the hearings on confirmation of the Modified Plan. That testimony revealed the following.

8312 at Ex. A pp. 2–4; Tr. 7/21/2011 at 204–05.)

**30.** The Court did not permit discovery of any analyses that the Settlement Noteholders did

The Debtors and JPMC began negotiating a resolution of their disputes about ownership of various assets in March 2009. (Tr. 7/18/2011 at 55; Tr. 7/21/2011 at 101.) Those negotiations continued off and on until the announcement that the parties had reached an agreement in principal on March 4, 2010, and the terms were read into the record on March 12, 2010. (Tr. 7/19/2011 at 144; Tr. 7/20/2011 at 74–75.) The settlement negotiations included the exchange of term sheets between the Debtors and JPMC reflecting the parties' relative stances on settlement of issues related to the ownership of disputed assets. (Tr. 7/18/2011 at 67–68; Tr. 7/19/2011 at 130–35.) Counsel for the Settlement Noteholders, Fried Frank, participated in many of these negotiations, though they were precluded from sharing information with the Settlement Noteholders unless the latter were under confidentiality agreements. (Tr. 7/18/2011 at 57–59, 116, 119; Tr. 7/19/2011 at 144; Tr. 7/20/2011 at 75; Tr. 7/21/2011 at 136.)

At times during that period, the Settlement Noteholders also participated directly in the negotiations. (Tr. 7/18/2011 at 55; Tr. 7/21/2011 at 101.) As a condition to their participation, the Settlement Noteholders entered into confidentiality agreements with the Debtors. (Tr. 7/20/2011 at 198.) During the two formal confidentiality periods, the Settlement Noteholders were required to restrict trading of the Debtors' securities or to establish an ethical wall (precluding any confidential information from being used by their traders). (*Id.*)

The First Confidentiality Period ran from March 9 to May 8, 2009. (EC 24.)

in determining whether to trade in the Debtors' securities. The Settlement Noteholders asserted that analysis was privileged and not relevant.

Only Aurelius established an ethical wall during the First Confidentiality Period; the others restricted their trading. (Tr. 7/18/2011 at 55.) Immediately after the First Confidentiality Period, the Settlement Noteholders shared all confidential information they had received from the Debtors with their traders and actively traded in the Debtors' securities. (AOC 18; AOC 54; AOC 62; Au 8.) That information included the amount of a tax refund the Debtors estimated they would receive (in excess of $2 billion), which information the Debtors also made public. (D.I. 970; D 427; Tr. 7/18/2011 at 65, 79, 144; Tr. 7/20/2011 at 232–33.) The Debtors did not, however, make public any of the settlement term sheets or even the fact that settlement negotiations were occurring.

After the conclusion of the First Confidentiality Period, two of the Settlement Noteholders (Appaloosa and Centerbridge) independently approached JPMC in July and August 2009 in an effort to further negotiations. (Tr. 7/20/2011 at 54–55.) Term sheets were exchanged. (EC 14; EC 115; Tr. 7/20/2011 at 57–58, 243; Tr. 7/21/2011 at 32–33.) Appaloosa restricted its trading during these negotiations, while Centerbridge restricted trading only upon receipt of a counter-proposal from JPMC on August 18, 2009. (Tr. 7/20/2011 at 58–59, 130, 244–45.) JPMC withdrew its counter-proposal in early September 2009. (*Id.* at 58–59, 244–45.)

Negotiations did not resume again until the Second Confidentiality Period, which ran from November 16 to December 31, 2009 (the "Second Confidentiality Period"). (EC 37; EC 117; EC 148; Tr. 7/18/2011 at 105; Tr. 7/19/2011 at 139–40; Tr. 7/21/2011 at 128–29.) During the Second Confidentiality Period, all the Settlement Noteholders restricted trading. (Tr. 7/18/2011 at 104–05; Tr. 7/19/2011 at 140; Tr. 7/20/2011 at 71–72, 246.) Near the end of the Second Confidentiality Period, Aurelius asked the Debtors to terminate the confidentiality period a day early. (Tr. 7/18/2011 at 111.) The Debtors agreed and again released to the public the Debtors' estimate of an additional tax refund (in excess of $2 billion) which the Debtors anticipated receiving because of a recent change in the tax laws. (D.I. 2077; D 428; Tr. 7/18/2011 at 105; Tr. 7/19/2011 at 141; Tr. 7/21/2011 at 127–28.) Once again, immediately after the Second Confidentiality Period, the Settlement Noteholders actively traded in the Debtors' securities using information they had received from the Debtors, including the status of settlement negotiations. (AOC 18; AOC 54; AOC 62; Au 8.)

Following the Second Confidentiality Period, the Settlement Noteholders' involvement in negotiations was limited to a meeting with the Debtors in January and a meeting with the Debtors, JPMC, the FDIC, and the WMB Noteholders in February 2010 to discuss a proposed plan of reorganization, how the Debtors' assets would be distributed under a plan (the "Waterfall"), and updates on litigation. (Tr. 7/19/2011 at 62–63, 70; Tr. 7/21/2011 at 130.) One of the Settlement Noteholders, Appaloosa, also participated in a meeting with the Debtors and JPMC on March 1 and thereafter restricted its trading until the terms of the GSA were announced on March 12, 2010. (Tr. 7/20/2011 at 76–77, 96.) After the announcement of the GSA, the Debtors sent the Settlement Noteholders advance drafts of the plan of reorganization, disclosure statement, and Waterfall analyses. (EC 42; EC 34; Tr. 7/20/2011 at 77, 220, 262.) Upon receipt of those drafts, the Settlement Noteholders restricted trading until the documents were publicly filed. (AOC 18; Tr. 7/19/2011 at 77–78; Tr. 7/20/2011 at 77, 262.)

2. *Application of section 1129(a)(3)*

The Bankruptcy Code requires that, to be confirmed, a plan of reorganiza-

tion must be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). To meet this standard, the Third Circuit has stated that a plan must "fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir.2000). *See also In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 n. 5 (3d Cir.1986); *In re Madison Hotel Assocs.*, 749 F.2d 410, 424–25 (7th Cir.1984). To meet this standard, the plan proponent must establish that "(1) [the plan] fosters a result consistent with the Code's objectives ..., (2) the plan has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected ..., and (3) there was fundamental fairness in dealing with the creditors." *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 609 (Bankr.D.Del.2001). *Accord In re Frascella Enters., Inc.*, 360 B.R. 435, 446 (Bankr. E.D.Pa.2007).

The Settlement Noteholders, and the Debtors contend that the conduct of the Settlement Noteholders was in accordance with the terms of the parties' written confidentiality agreements and did not violate any law or duty that the Settlement Noteholders might have had. They contend that the Modified Plan is proposed in good faith and confirmable under section 1129(a)(3).

The Equity Committee objects to confirmation of the Modified Plan [31] asserting that it has not been proposed in good faith because the Settlement Noteholders "dominated" or "hijacked" the settlement negotiations and engaged in inequitable conduct, including trading in the Debtors' securities while in possession of material nonpublic information. The Plan Objectors specifically contend that the Settlement Noteholders used material nonpublic information to acquire a blocking position in the various creditor classes to get a seat at the negotiating table and assure that their claims got paid while nothing was given to the shareholders. *See, e.g., In re ACandS, Inc.*, 311 B.R. 36, 43 (Bankr.D.Del.2004) (finding a lack of good faith where pre-petition creditors committee dominated the debtor's affairs resulting in "obvious self-dealing"); *In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr.D.Del.2001) (denying confirmation for lack of good faith where debtor's CEO had an undisclosed million dollar consulting agreement with a creditor); *In re Unichem Corp.*, 72 B.R. 95, 100 (Bankr. N.D.Ill.1987) (finding lack of good faith where plan proponent breached fiduciary duties to debtor because "Congress did not intend the objectives and purposes of the Bankruptcy Code to include rewarding an individual for breaching his fiduciary duty").

Based on the record developed, the Court finds that the conduct of the Settlement Noteholders does not mean that the Plan was proposed in bad faith. Despite the allegations of insider trading by the Settlement Noteholders, the Court is unconvinced that their actions had a negative impact on the Plan or tainted the GSA.

Rather, the actions of the Settlement Noteholders appear to have helped increase the Debtors' estates. During the

---

**31.** The Equity Committee has also filed a motion seeking authority to prosecute an action against the Settlement Noteholders for equitable disallowance of their claims. Although the Motion only sought disallowance of the claims of Aurelius and Centerbridge, the Equity Committee's objection to confirmation asserts that equitable disallowance of the claims of all the Settlement Noteholders is warranted. At oral argument, the Equity Committee clarified that it seeks authority to bring such a claim against all four Settlement Noteholders.

240

First Confidentiality Period, the Settlement Noteholders, together with other creditors, persuaded the Debtors to submit a term sheet to JPMC that was more "aggressive" than the one the Debtors had initially contemplated. (Tr. 7/20/2011 at 50.) In addition, during the July negotiations that Appaloosa and Centerbridge had alone with JPMC, they persuaded JPMC to submit a counter-proposal that increased the share of the tax refunds that JPMC was willing to allocate to the Debtors. (EC 115; Tr. 7/20/2011 at 243.)

The cases cited by the Plan Objectors are distinguishable from the present facts. Both *Coram* and *Unichem* involved inequitable conduct of an executive of the debtor that lead to the conclusion that the debtor's plan was offered in bad faith. *Coram*, 271 B.R. at 234–35; *Unichem*, 72 B.R. at 99–100.

While *ACandS* is closer, the Court finds it distinguishable in important respects. In that case, the Court found that the pre-petition creditors' committee gained control of the debtor to the point where the committee alone made all the important decisions, including taking over the process of reviewing and settling all asbestos claims. 311 B.R. at 40.[32] In addition, the plan and settlement drafted by the committee and proposed by the debtor placed creditors in different classes for no discernible reason, other than the fact that creditors represented by the law firms on the committee were treated as secured creditors entitled to payment in full while other

creditors (with the same illness and manifestations) were treated as unsecured creditors entitled to little or nothing. *Id.* at 43.

While the evidence in this case shows that the Settlement Noteholders participated in the settlement negotiations and plan drafting and review, the Court finds that it falls short of the almost total control exercised by the committee in *ACandS*. The Settlement Noteholders were only one of several groups of creditors involved in this case, including the WMI Noteholders and the WMB Noteholders. Nor does the Modified Plan have the fatal flaw of improper classification and treatment of claims that the *ACandS* plan had. In this case, the creditor classes are treated in accordance with the priorities of the Bankruptcy Code and their contractual subordination rights. If the Settlement Noteholders had improperly dominated the case as in *ACandS*, the Modified Plan would have elevated the treatment of the PIERS class (in which they hold the bulk of their claims); instead the PIERS are receiving the treatment warranted by their subordinated status.

While the Court is not suggesting that the Settlement Noteholders be commended for their actions, the record shows their actions do not support a conclusion that the Modified Plan cannot be confirmed because it has been proposed in bad faith. The harm caused by the Settlement Noteholders has or can be remedied by other means.[33] *See infra* Part H.

32. The Court in *ACandS* was particularly concerned to learn that while counsel for the debtor was purportedly reviewing and settling claims, in fact that task was subcontracted to a company whose sole principal was a paralegal from the law firm that served as chair of the pre-petition creditors' committee. 311 B.R. at 40. The settlement of claims by that firm appeared to favor creditors represented by the members of the committee. *Id.*

33. The Court in its January 7 Opinion held that the Settlement Noteholders were not entitled to releases. 442 B.R. at 349. In addition, the Court held that the Settlement Noteholders' almost exclusive right to participate in the rights offering discriminated against other creditors in the same class. *Id.* at 361. The rights offering has subsequently been removed. (Tr. 2/18/2011 at 80–81.)

## E. Best Interests of Creditors

██ The Plan Objectors continue to press their arguments that the Modified Plan violates the best interests of creditors test articulated in section 1129(a)(7). That section requires that a plan of reorganization provide non-consenting impaired creditors (and shareholders) with at least as much as they would receive if the debtor was liquidating in chapter 7. 11 U.S.C. § 1129(a)(7). *See, e.g., In re U.S. Wireless Data, Inc.,* 547 F.3d 484, 495 (2d Cir.2008). The Plan Objectors raise many reasons why the Modified Plan does not comply with that section.

### 1. Contract v. federal judgment rate

#### a. Plan Objectors

██ The Plan Objectors contend that the Modified Plan fails to comply with the best interests of creditors test because it provides for the payment of post-petition interest on creditors' claims at their contract rate of interest rather than at the federal judgment rate. This results, they argue, in the creditors receiving more (and the shareholders accordingly receiving less) than they would under a chapter 7 liquidation.[34]

██ The general rule is that unsecured creditors are not entitled to recover post-petition interest. *United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 372–73, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) (holding that only oversecured creditors are entitled to receive post-petition interest under section 506(b)). There is an exception to the general rule, however, when the debtor is solvent. *See*

*Onink v. Cardelucci (In re Cardelucci),* 285 F.3d 1231, 1234 (9th Cir.2002) (finding that when a debtor is solvent, unsecured creditors are entitled to post-petition interest at the "legal rate"). This is so because under a chapter 7 liquidation, where the debtor is solvent, unsecured creditors are entitled to post-petition interest on their claims before shareholders receive any distribution. 11 U.S.C. § 726(a)(5) & (6) (stating that in a chapter 7 case unsecured creditors are entitled to interest at the legal rate from the date of the filing of the petition before any payment can be made to the debtor or equity). *See, e.g., Kitrosser v. The CIT Grp./Factoring, Inc.,* 177 B.R. 458, 469 (S.D.N.Y.1995) ("Although the requirements of Chapter 7 are in general not applicable to Chapter 11 proceedings ... Section 726 does apply through the requirements of Section 1129."); *In re Premier Entm't Biloxi LLC,* 445 B.R. 582, 644 (Bankr.S.D.Miss.2010) ("Section 726 applies indirectly to chapter 11 cases by virtue of the 'best interests of creditors' test in § 1129, under which distributions proposed under a plan of reorganization under chapter 11 must at least equal the amount that would have been paid in a liquidation under chapter 7.").

The Plan Objectors contend that the majority of courts to address this issue conclude that "the legal rate" due under section 726(a)(5) is the federal judgment rate. *See, e.g., Cardelucci,* 285 F.3d at 1234 (concluding that federal judgment rate, rather than state judgment rate or contract rate, was due on unsecured claims under section 726(a)(5) for purposes of best interests of creditors test); *In re Garriock,* 373 B.R. 814, 816 (E.D.Va.2007)

---

34. This could also conflict with the requirements of the fair and equitable test under section 1129(b). Although that section embodies the absolute priority rule, which forbids junior classes of creditors or equity from receiving any distribution until senior creditors are paid in full, it also mandates that senior creditors not receive more than 100% of their claim before junior classes receive a distribution. *See, e.g., Exide Techs.,* 303 B.R. at 61 (Bankr.D.Del.2003).

("Having reviewed each line of cases, the Court is persuaded that 'the legal rate' refers to the federal judgment rate, and does not encompass ... any lawful pre-petition contract rate."); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 257 (Bankr. S.D.N.Y.2007) (concluding that "[i]t is by far the better view, in my opinion, that 'legal rate' is the federal judgment rate and not the same as that authorized under section 506(b), which is the contract rate."); *In re Best*, 365 B.R. 725, 727 (Bankr.W.D.Ky.2007) ("The more recent cases hold that the federal judgment rate is the proper rate of interest under 11 U.S.C. § 726(a)(5)"); *In re Dow Corning Corp.*, 237 B.R. 380, 412 (Bankr.E.D.Mich. 1999) (determining that the phrase "interest at the legal rate" means the federal judgment rate); *In re Chiapetta*, 159 B.R. 152, 161 (Bankr.E.D.Pa.1993) ("[W]e further conclude that, since a claim is like a judgment entered at the time of the bankruptcy filing, the applicable rate should be the federal judgment rate...."); *In re Melenyzer*, 143 B.R. 829, 832–33 (Bankr. W.D.Tex.1992) (concluding that the appropriate rate of interest payable to unsecured creditors pursuant to section 726(a)(5) is the federal judgment rate).

 The Plan Supporters argue, however, that the Court has already decided this issue in the January 7 Opinion and concluded that the contract rate was the presumed rate under section 726(a)(5) unless the equities of the case mandate otherwise. They contend that ruling is the law of the case and cannot be reargued.

The Court disagrees with the Plan Supporters on this point. In the January 7 Opinion, the Court did not conclude that the contract rate was the presumed rate, it merely cited a line of cases that so hold.

442 B.R. at 358. At the same time, however, the Court noted that there is a line of cases that hold that the federal judgment rate is the appropriate rate under section 726(a)(5). *Id.* at 357–58. The Court also noted that it had previously "concluded that *the federal judgment rate was the minimum that must be paid* to unsecured creditors in a solvent debtor case under a plan to meet the best interest of creditors' test, but that the Court had discretion to alter it." *Id.* at 358 (emphasis added) (citing *Coram*, 315 B.R. at 346). The Court, however, did not decide the question in this case, because the Court believed it needed to consider the equities of the case.

Now that all issues have been presented to the Court, the Court concludes that the better view is that the federal judgment rate is the appropriate rate to be applied under section 726(a)(5), rather than the contract rate.[35] The Court's conclusion is supported by many factors.

First, section 726(a)(5) states that interest on unsecured claims shall be paid at "the legal rate" as opposed to "a" legal rate or the contract rate. As the LTW Holders note, where Congress intended that the contract rate of interest apply, it so stated. *See* 11 U.S.C. § 506(b) (stating that if a secured creditor is over-secured, the creditor shall be entitled to "interest on such claim ... provided for *under the agreement* or State statute under which such claim arose.") (emphasis added). *See also Adelphia Commc'ns*, 368 B.R. at 257; *Dow*, 237 B.R. at 405–06 (holding that use of term "legal" as opposed to "contract" rate mandated conclusion that Congress meant "a rate fixed by statute").

Second, the payment of post-judgment interest is procedural by nature and dictat-

---

**35.** To the extent I suggested in *Coram* that the federal judgment rate was not required by section 726(a)(5), I was wrong. 315 B.R. at

346 (applying federal judgment rate nonetheless because of the equities of the case).

ed by federal law rather than state law, further supporting use of the federal judgment rate. *Cardelucci*, 285 F.3d at 1235 (citing *Hanna v. Plumer*, 380 U.S. 460, 473–74, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965)).

Third, the use of the federal judgment rate promotes two important bankruptcy goals: "fairness among creditors and administrative efficiency." *Cardelucci*, 285 F.3d at 1236. *See also Best*, 365 B.R. at 727 (federal judgment rate provides "an efficient and inexpensive means of calculating the amount of interest to be paid to each creditor"); *Dow*, 237 B.R. at 407 (providing a uniform rate "keeps the bankruptcy estate from being saddled with potentially difficult and time-consuming administrative burdens" of determining what rate is applicable to each creditor's claim); *Melenyzer*, 143 B.R. at 833 (federal judgment rate provides court with an "easily ascertainable, nationally uniform rate" and increases predictability in the process).

The Court finds that the line of cases holding there is a presumption the contract rate applies are distinguishable and/or unpersuasive. *See, e.g., Dow*, 456 F.3d at 676–79 (remanding to bankruptcy court to determine if equities of case permitted allowance of default interest to creditors rather than the contract rate); *In re Southland Corp.*, 160 F.3d 1054, 1059–60 (5th Cir.1998) (determining rate of interest for an over-secured creditor); *In re Chi., Milwaukee, St. Paul & Pac. R.R. Co.*, 791 F.2d 524, 529–30 (7th Cir.1986) (in case under railroad reorganization chapter of Bankruptcy Act, court held that creditors were entitled only to contract default rate, not higher market rate, without discussing federal judgment rate).

The Indenture Trustee for the PIERS urges the Court not to be swayed by arguments that equity will receive a recovery if the federal judgment rate is used rather than the contract rate, because that is not a factor which courts should consider. *See, e.g., Urban Communicators PCS LP v. Gabriel Capital, L.P.*, 394 B.R. 325, 340 (S.D.N.Y.2008) (holding that "it is not inequitable to cut down the interest of Debtors' shareholders by interest payments at a default rate to which the Debtors contractually agreed"); *In re Int'l Hydro–Elec. Sys.*, 101 F.Supp. 222, 224 (D.Mass.1951) (holding that "[t]he burden of ... payment [of post-petition interest on interest] will fall entirely on the interest of the stockholders ... [who] cannot complain that they are treated inequitably when their interest is cut down by the payment of a sum to which the debenture holders are clearly entitled by the express provisions of the trust indenture.").

■ The cases cited by the Indenture Trustee are not on point. The *Urban Communicators* Court was considering what was due to an over-secured creditor under section 506(b) rather than what post-petition interest is due to unsecured creditors under section 726(a)(5). 394 B.R. at 333–34. The *Int'l Hydro–Elec.* Court was dealing with the rearrangement of a public utility company under title 15, not a reorganization under title 11. 101 F.Supp. at 223. Nonetheless, the Court agrees that the effect on equity is not an appropriate factor to be considered, and the Court will not consider that. In applying the plain language of the statute, however, the Court concludes that the federal judgment rate is the proper measure for post-petition interest due to the unsecured creditors.

Even if a consideration of the equities was appropriate, after considering the evidence in this case, the Court does not find that the equities support the use of anything other than the federal judgment rate. *Cf. Cardelucci*, 285 F.3d at 1236 (rejecting argument that in cases where all creditors could get paid contract rate of

interest, debtor would be getting a windfall if creditors' interest claims are limited by the federal judgment rate because " 'interest at the legal rate' is a statutory term with a definitive meaning that cannot shift depending on the interests invoked by the specific factual circumstances before the court.").

The Plan Supporters argue, however, that payment of the various contract rates of interest as provided in the Modified Plan is warranted because the distribution scheme is simply a function of the subordination provisions in the various creditors' contracts (the Senior Subordinated Indenture, the CCB–1 Guarantee Agreements, the CCB–2 Guarantee Agreements, the Junior Subordinated Notes Indenture, and the PIERS Guarantee Agreement) which they say mandate that the subordinated creditors pay the senior creditors their claims in full, including contract interest. (*See* WMI NG 1–7.)

The TPS Consortium disputes this contention. It argues that the Debtors are only obligated to pay to each creditor class their allowed claims and interest at the rate required by the Code. To the extent that the creditors have agreements among themselves—for one class to pay over its distribution to another class—it does not impact the obligations of the Debtors. *See, e.g., Bank of Am. N.A. v. N. LaSalle St. Ltd. P'ship (In re 203 N. LaSalle St. P'ship),* 246 B.R. 325, 330 (Bankr.N.D.Ill. 2000) (holding that senior creditor could assert its unsecured deficiency claim against subordinated creditor even though it was a non-recourse obligation and could not be collected from the debtor); *First Fidelity Bank, N.A. v. Midlantic Nat'l Bank (In re Ionosphere Clubs, Inc.),* 134 B.R. 528, 532 (Bankr.S.D.N.Y.1991) (concluding that because creditors were undersecured, senior creditors were entitled to interest only from the distributions due to

subordinated creditors); *In re Smith,* 77 B.R. 624, 627 (Bankr.N.D.Ohio 1987) (holding that subordination agreements between creditors "may not impair the rights of the other creditors" and that "the amount of claims against the Debtor, and the distribution to uninvolved creditors, remain unaffected"). *See also* Patrick Darby, *Southeast and New England Mean New York: The Rule of Explicitness and Post–Bankruptcy Interest on Senior Unsecured Indebtedness,* 38 Cum. L. Rev. 467, 477 (where interest claim is not allowed under Bankruptcy Code, the senior creditor must seek to collect that interest from subordinated creditors).

The Court agrees with the TPS Consortium's argument. The fact that some of the creditors have contractually agreed to pay their distribution to other creditors does not mean that the Debtors are required to make payments to the senior creditors that are more than the Bankruptcy Code allows, while preserving the subordinated creditors' claims against the estate. While the Debtors can, through a plan of reorganization, effectuate the subordination agreements by diverting payments from subordinated creditors to senior creditors, that cannot affect the total claims against the estate, which do not include post-petition interest on any unsecured claim at more than the federal judgment rate. *See, e.g., First Fidelity,* 134 B.R. at 532; *Smith,* 77 B.R. at 627.

b. *WMI Senior Noteholders' Group*

The WMI Senior Noteholders' Group argues that the best interest of creditors test mandates that the Court award them the *higher* of the federal judgment rate and the contract rate on their floating interest rate bonds. During certain periods throughout the case, the contract rate on the floating interest bonds was actually less than the federal judgment rate. Consequently, the WMI Senior Noteholders'

Group argues that if they are awarded only their contract rate of interest, it would lead to the absurd result of junior creditors getting paid post-petition interest at a higher rate than senior creditors.

This argument is moot because the Court is not awarding anyone post-petition interest at the contract rate. The WMI Senior Noteholders are entitled under section 726(a)(5) only to the federal judgment rate of interest from the Debtors, the same as all other unsecured creditors. To the extent that this results in them getting more or less than their contract rate of interest, it may be a matter between them and the other creditors who are parties to a subordination agreement, but it is irrelevant to the Debtors' obligations under the Bankruptcy Code.

### c. General unsecured creditors

The Creditors' Committee argues that application of the federal judgment rate is inequitable in this case because the only class that is adversely affected by doing so is the class of general unsecured creditors. It cites the Debtors' updated liquidation analysis which shows that, after application of the subordination provisions, the general unsecured creditors are the only ones who will receive less by application of the federal judgment rate than by application of the contract rate. (D 375; Tr. 7/14/2011 at 61–62, 82, 170.)

This is, of course, true in total dollars because none of the general unsecured creditors will be getting a contract rate of interest. (D 375.) However, they will be getting a higher percentage of the post-petition interest to which they are entitled under the federal judgment rate (76%) than under the contract rate (29%), because of the limitation on payment of interest to senior creditors. (*Id.*) Further, it is irrelevant that general unsecured creditors would get more in dollars if the Court were to award contract rates of interest,

because they are simply not entitled to receive that rate under sections 726(a)(5) and 1129(a)(7).

The Creditors' Committee also contends that further delay will be caused by the Court denying confirmation of the Modified Plan because of the need to make further revisions and perhaps re-solicit, which will further erode recoveries for the lower creditor classes. (D 254, D 375; Tr. 7/14/2011 at 43–44, 71–72.)

This of course does not justify ignoring the requirements of the Bankruptcy Code. As the LTW Holders note, further delay might have been avoided by the Debtors if the Modified Plan had simply provided that post-petition interest would be paid to unsecured creditors at whatever rate the Court determined was appropriate.

### 2. Date of computation of federal judgment rate

The Plan Objectors contend that if the federal judgment rate of interest is paid on creditors' claims, it should not be the rate as of the petition date. They propose calculating it as of different dates largely because shortly after this case was filed, the federal judgment rate fell precipitously from 1.95% to as low as .18% as of June 16, 2011. (EC 301.)

The Equity Committee argues that the post-petition interest rate should be either the rate as of the Effective Date of any confirmed plan or a floating monthly rate. The Equity Committee argues that this is appropriate because the purpose of post-petition interest is to compensate the creditors for the time value of their money and should reflect the different rates applicable during the pendency of the case. *See, e.g., Melenyzer,* 143 B.R. at 833.

The Court rejects this argument, however, because similar arguments have been made to justify using market or contract rates but were rejected. *Id.* at 832–33.

The TPS Consortium argues that the confirmation date is the appropriate date to use because the federal judgment rate is derived from section 1961(a) of title 28 which states that interest shall be paid "from the date of the entry of the judgment." The TPS Consortium argues that none of the claims at issue derive from any judgment and that the most analogous order to a judgment is the confirmation order because it establishes the parties' rights. *See, e.g., In re Am. Preferred Prescription, Inc.*, 255 F.3d 87, 92 (2d Cir. 2001) ("The confirmation of a plan in a Chapter 11 proceeding is an event comparable to the entry of a final judgment in an ordinary civil litigation."); *Johnson v. Stemple (In re Stemple)*, 361 B.R. 778, 796 (Bankr.E.D.Va.2007) (holding that "orders of confirmation, like myriad orders entered by this Court, are considered final judgments, thus triggering the doctrines of res judicata and/or collateral estoppel.").

The Plan Supporters disagree arguing that, in the event the Court finds that the federal judgment rate is the appropriate rate to be paid for post-petition interest, it should be the rate that was applicable as of the petition date, because it is from that date that the creditors are measuring the loss of the use of their money. *See, e.g., In re Evans*, Bankr.No. 10–80446C, 2010 WL 2976165, at *2 (Bankr.M.D.N.C. July 28, 2010) (holding that the "date on which the applicable federal judgment rate is to be determined for purposes of section 726(a)(5) is the federal judgment rate in effect on the petition date"); *In re Gulfport Pilots Ass'n, Inc.*, 434 B.R. 380, 392–93 (Bankr.S.D.Miss.2010) (stating that if the debtor were solvent, creditor would be entitled to post-petition interest at the federal judgment rate in effect on the petition date); *Best*, 365 B.R. at 727 (holding that the legal rate "mean[s] the federal judgment interest rate at the date the petition is filed"); *Chiapetta*, 159 B.R. at 161 (hold-

ing that "since a claim is like a judgment entered at the time of the bankruptcy filing, the applicable rate should be the federal judgment rate in effect at the time of the bankruptcy filing"); *Melenyzer*, 143 B.R. at 833 (holding that "for purposes of [section] 726(a)(5), the federal judgment rate selected should be that in effect as of the date of filing, as opposed to the date of distribution.... Setting the legal rate of interest as of the date of distribution ... makes little sense.").

The Court agrees with the Plan Supporters on this point. The statute expressly provides that such interest shall be paid "at the legal rate from the date of the filing of the petition" suggesting that it is the interest rate effective on the petition date that should be used. 11 U.S.C. § 726(a)(5). The case law is uniform in holding that it is the petition date at which the federal judgment rate is determined for purposes of awarding interest under section 726(a)(5). *See, e.g., Evans*, 2010 WL 2976165, at *2; *Gulfport Pilots Ass'n*, 434 B.R. at 393; *Best*, 365 B.R. at 727; *Chiapetta*, 159 B.R. at 161; *Melenyzer*, 143 B.R. at 833.

### 3. *Compounding of interest*

■ The Modified Plan provides that "interest shall continue to accrue only on the then outstanding and unpaid obligation or liability, including any Post-petition Interest Claim thereon, that is the subject of an Allowed Claim." (D 255 at § 1.151.) The Equity Committee contends that this compounding of interest is not permissible. *See, e.g., Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 165–66, 67 S.Ct. 237, 91 L.Ed. 162 (1946) (holding that interest on interest is not allowable on equitable principles); *Chi., Milwaukee, St. Paul & Pac. R.R.*, 791 F.2d at 532 (denying compounding of interest because it would result in a windfall for the deben-

ture holders); *In re Anderson*, 69 B.R. 105, 109 (9th Cir. BAP 1986) (affirming bankruptcy court's denial of interest on interest); *In re The N.Y., New Haven and Hartford R.R. Co.*, 4 B.R. 758, 799 (D.Conn.1980) (denying interest on interest under the principles articulated in *Vanston* ).

The Debtors respond that compound interest is being paid because that is exactly what the Debtors are obligated to pay under the indentures. (*See, e.g.,* WMI NG 1 at § 5.3.)

The Court rejects the Debtors' argument. Once again, in awarding post-petition interest to creditors in this case, the Court is doing so not because of any contractual right they may have to it. Their contractual right to compound interest has been eliminated (as not "allowed") by section 502(b)(2). Their entitlement to post-petition interest is being granted only as required by the terms of section 726(a)(5), which the Court determines is the federal judgment rate. The latter permits only annual compounding of interest. 28 U.S.C. § 1961(b) (providing that "[i]nterest shall be computed daily to the date of payment ... and shall be compounded annually."). *See also Curry v. Am. Int'l Grp., Inc., Plan No. 502*, 579 F.Supp.2d 424, 426 (noting that the federal judgment rate is "compounded annually").

■ Because the Court concludes that creditors are only entitled to the payment of interest from the Debtors at the federal judgment interest rate in effect on the petition date, compounded annually, the Court finds that the Modified Plan which provides for payment of the contract rate violates the best interests of creditors test. 11 U.S.C. §§ 726(a)(5) & 1129(a)(7).

4. *Payment of subordinated claims*

■ The WMB Noteholders object to the Modified Plan because it provides that senior unsecured creditors will receive post-petition interest on their claims before the WMB Noteholders' subordinated claims are paid. They contend that this violates the best interests of creditors test because they will not receive at least as much as they would receive under chapter 7 according to the provisions of section 726.

The WMB Noteholders have stipulated that their claims are subordinated to general unsecured claims because they hold claims arising from rescission of a purchase or sale of a security of WMB, an affiliate of the Debtors. 11 U.S.C. § 510(b). Although the distribution scheme in section 726 expressly provides that it is subject to section 510, the WMB Noteholders contend that section 510(b) only subordinates them to "all claims or interests that are senior to or equal the claim or interest represented by such security." *Id.* They argue that because their securities were bonds issued by WMB, i.e. debt, that their claims are only subordinated to the general unsecured claims of the Debtors and not to equity. Although case law is sparse on this issue, they contend that it supports their theory. *See, e.g., In re El Paso Refinery, L.P.*, 244 B.R. 613, 624–25 (Bankr.W.D.Tex.2000) (holding that a subordinated claim is subordinated only to other general unsecured claims of the same type but not to interest unless the subordinated claim is itself a claim for interest).

The Indenture Trustee for the PIERS responds that the Modified Plan properly provides for post-petition interest on unsecured claims before any distribution is due to subordinated creditors such as the WMB Noteholders. The Indenture Trustee for the PIERS notes that section 726 is expressly subject to section 510. 11 U.S.C. § 726(a). *See also, In re Virtual*

*Network, Servs. Corp.,* 902 F.2d 1246, 1249 (7th Cir.1990); *Wash. Mut.,* 442 B.R. at 357; *In re Rago,* 149 B.R. 882, 889 (Bankr. N.D.Ill.1992).

At oral argument, the Indenture Trustee for the PIERS argued that section 510(b) subordinates the WMB Noteholders' claims to all "claims." 11 U.S.C. § 510(b). (Tr. 8/24/2011 at 185–87.) The definition of "claim" includes all "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, *unmatured,* disputed, undisputed, legal, equitable, secured, or unsecured." *Id.* at § 101(5) (emphasis added). The Indenture Trustee for the PIERS contends that this definition includes unmatured (i.e., post-petition) interest. Although section 502(b)(2) provides that "allowed" claims do not include unmatured interest, the subordination in section 510(b) is to "claims" not "allowed claims." *Id.* at § 510(b). In contrast, section 510(c) provides for equitable subordination to "allowed claims" only. *Id.* at § 510(c)(1).

The Court agrees with the argument of the Indenture Trustee for the PIERS. According to the plain language of sections 510 and 726, the WMB Noteholders are subordinated to all "claims," the definition of which includes unmatured interest on those claims. Therefore, the Court concludes that unsecured creditors are entitled to post-petition interest on their claims before any distribution to the WMB Noteholders.

5. *Effect on subordination rights*

 The PIERS Holders [36] argue that if the Court determines that the Debtors are only obligated to pay creditors at the federal judgment rate of interest, then that is all the senior creditors are entitled to receive and the subordinated creditors are not obligated to pay them the difference between what the Debtors pay and their contract rate of interest.

The WMI Senior Noteholders' Group and WMI Senior Noteholders' Indenture Trustee disagree. They contend that the subordination provisions in the various creditors' contracts (the Senior Subordinated Indenture, the CCB–1 Guarantee Agreements, the CCB–2 Guarantee Agreements, the Junior Subordinated Notes Indenture, and the PIERS Guarantee Agreement) mandate that the subordinated creditors pay the senior creditors their claims in full, including contract interest. (WMI NG 1 at § 15.3; WMI NG 2 at § 15.3; WMI NG 3 at § 3(a) & (b); WMI NG 4 at § 15.01; WMI NG 5 at § 3(a) & (b); WMI NG 6 at § 12.2; WMI NG 7 at § 6.1.)

 The PIERS Holders contend that the subordination provisions do not require that they pay the senior creditors their full contract rate of interest because it does not explicitly refer to the rate of post-petition interest to which they are subordinate. Therefore, the PIERS Holders contend that the interest they are subordinated to is only the rate the Court determines is appropriate. They rely on the Rule of Explicitness, which provides that in order to subordinate junior creditors the indenture must explicitly provide for that outcome. *See, e.g., In re King Res. Co.,* 528 F.2d 789, 791 (10th Cir.1976) (adopting holdings in *Kingsboro* and *Time Sales* that "where the subordinating provisions are unclear or ambiguous as to whether post-petition interest is to be allowed a senior creditor, the general rule that interest stops on the date of filing of the petition in bankruptcy is to be followed"); *In re Kingsboro Mort. Corp.,* 514 F.2d 400, 401

---

**36.** The PIERS Holders include Normandy Hill Capital L.P. (an individual PIERS holder) and Wells Fargo Bank, NA, the Indenture Trustee for the PIERS.

(2d Cir.1975) (holding that language of subordination agreement requiring payment in full of "all principal and interest on all Senior Debt" was insufficiently express to apply to post-petition interest); *In re Time Sales Fin. Corp.*, 491 F.2d 841, 844 (3d Cir.1974) (affirming denial of enforcement of subordination agreement for payment of post-petition interest because the agreement "did not appropriately apprise the debenture note holders that their claims against the bankrupt would be subordinated to [the senior creditor's] demand for post-petition interest").

The WMI Senior Noteholders' Group responds that the Rule of Explicitness no longer applies since passage of the Bankruptcy Code and the enactment of section 510. *See, e.g., In re Bank of New England Corp.*, 364 F.3d 355, 362, 365 (1st Cir.2004) (concluding that "the enactment of section 510(a) [of the Bankruptcy Code] means that the enforcement of subordination provisions is no longer a matter committed to the bankruptcy courts' notions of what may (or may not) be equitable" and therefore the Rule of Explicitness is no longer applicable); *Chem. Bank v. First Trust of N.Y. (In re Southeast Banking Corp.)*, 156 F.3d 1114, 1124 (11th Cir.1998) (stating that "we conclude that Congress, by enacting section 510(a) of the Bankruptcy Code, abrogated the pre-Code Rule of Explicitness. As a necessary consequence of this change in bankruptcy law, the Rule of Explicitness can no longer survive as the progeny of the bankruptcy courts' equity powers or as a federal canon of contract construction.").

The Court disagrees with the argument of the WMI Senior Noteholders' Group that the Rule of Explicitness is no longer applicable. While section 510(a) provides that subordination agreements are enforceable, it states that they are only enforceable "to the same extent that such agreement is enforceable under applicable law." 11 U.S.C. § 510(a). In the *Southeast Banking Corp.* case, the Eleventh Circuit certified to the New York Court of Appeals the question of the applicability of the Rule of Explicitness under New York law.[37] 156 F.3d at 1126. The New York Court of Appeals answered the question in the affirmative, stating that "[i]n accordance with the Rule of Explicitness, New York law would require specific language in a subordination agreement to alert a junior creditor to its assumption of the risk and burden of allowing the payment of a senior creditor's post-petition interest demand." *Chem. Bank v. First Trust of N.Y. (In re Southeast Banking Corp.)*, 93 N.Y.2d 178, 186, 688 N.Y.S.2d 484, 710 N.E.2d 1083 (N.Y.1999). As a result, the Eleventh Circuit held that the language of the subordination provision was insufficiently precise on the issue of post-petition interest to satisfy the Rule of Explicitness under New York law. *Chem. Bank v. First Trust of N.Y. (In re Southeast Banking Corp.)*, 179 F.3d 1307, 1310 (11th Cir. 1999). *See also, First Fidelity Bank, N.A. v. Midlantic Nat'l Bank (In re Ionosphere Clubs, Inc.)*, 134 B.R. 528, 534–35 (Bankr. S.D.N.Y.1991) (concluding that the Rule of Explicitness articulated in *"Kingsboro* retains its vitality and remains the controlling law in the Second Circuit" under the Bankruptcy Code and refusing to enforce subordination agreement that would pay post-petition interest to senior creditors because of lack of specificity in the indenture).

The WMI Senior Noteholders' Indenture Trustee further argues, however, that

---

**37.** The Indentures are governed by New York law. (WMI NG 1 at § 1.12; WMI NG 2 at § 1.12; WMI NG 3 at § 6(a); WMI NG 4 at § 14.05; WMI NG 5 at § 6(a); WMI NG 6 at § 1.11; WMI NG 7 at § 9.4.)

Normandy Hill is relying on a prior version of the Indenture Agreement and does not refer to critical language from the subordination provision. The Indenture Trustee contends that the correct version of the subordination provision requires subordination to Senior Indebtedness, which is defined as "principal of, premium, if any, interest (including all interest accruing subsequent to the commencement of any bankruptcy or similar proceeding, whether or not a claim for post-petition interest is allowable as a claim in any such proceeding)." (WMI NG 7 at 6.) [38]

The Court concludes that the WMI Senior Noteholders' Group and the Senior Noteholders' Indenture Trustee are correct. The subordination provisions adequately apprised the subordinated creditors that their payments were subordinate to *all* contractual post-petition interest, even if the Court allowed *none.* They certainly, therefore, were on notice that they were subordinate to contractual post-petition interest if the Court allowed *some.* Therefore, the Court concludes that to the extent the Rule of Explicitness is still applicable, the indentures at issue in this case meet its requirements.[39] Therefore, the Plan provisions that give effect to the subordination provisions in the indentures and require subordinated creditors to pay senior creditors post-petition interest at the contract rate even though the Debtors are only required to pay interest at the federal judgment rate are not violative of the Bankruptcy Code.[40]

### 6. *Releases for distributions*

■ The Equity Committee also objects to confirmation of the Modified Plan because it conditions distributions to creditors and other stakeholders on granting a direct release to JPMC and other non-debtors. (D 255 at §§ 43.2 & 43.6.) The Equity Committee contends that this violates the best interests of creditors test under section 1129(a)(7). *See, e.g., AOV Indus.,* 792 F.2d at 1151 (holding that plan which required a creditor who had a unique direct claim against plan funder to provide a release of plan funder to get a distribution unfairly discriminated against it because majority of creditors had no such claim); *In re Conseco,* 301 B.R. 525, 528 (Bankr.N.D.Ill.2003) (holding that plan provision predicating receipt of distribution on granting third party releases violated best interest of creditors test because creditors could not be held to have voluntarily agreed to a release simply by accepting a distribution).

The Equity Committee argues that under chapter 7, even though preferred shareholders are not projected by the Debtors to receive any distribution, they would still retain their claims against third parties including JPMC. Therefore, be-

---

**38.** The Indenture Trustee notes that it would have been impossible to give notice to the subordinated creditors of exactly what interest rate they were subordinated to, because the PIERS were issued in 2001 and the Senior Notes were issued between November 2003 and August 2006 with varying rates of interest. (WMI NG 1–7.)

**39.** According to Normandy Hill, however, to hold as the WMI Senior Noteholders' Group argues would penalize the subordinated creditors for the bad acts of the senior creditors. It assumes that the Court can apply the federal judgment interest rate only if it finds that

the Settlement Noteholders engaged in improper conduct. Because the Court finds that the federal judgment interest rate is the rate due under section 726(a)(5) without considering the equities of the case, Normandy Hill's argument on this point is moot. (*See supra* Part E1.)

**40.** While the PIERS may receive payment in full of their claims from the Debtors, they may be required to give a part of their distribution to senior creditors. This, however, is simply a result of the terms they accepted when investing in a subordinated note.

cause the preferred shareholders are not getting any consideration under the Plan for their agreement to release JPMC and the others, they should be able to receive a distribution without granting a release to JPMC and the FDIC.

The Plan Supporters disagree. They contend that the releases are a condition to the GSA imposed by JPMC and the FDIC. They argue that the $7 billion in assets which are being used to provide a recovery for creditors is only available because JPMC and the FDIC have agreed to waive their claims of ownership of certain assets and to waive in excess of $54 billion in claims they hold against the estates. They argue that without the GSA, creditors (and shareholders) would get no recovery.

The Court finds that the condition requiring a release in order to receive a distribution does not violate the best interest of creditors test. Any potential recovery which shareholders may receive, even from the Liquidating Trust, is largely due to the GSA which is funding the payments to creditors who are senior in priority to the shareholders and who, in the absence of the GSA, would have first priority to the proceeds of the assets in the Liquidating Trust. In addition, granting a release is purely voluntary. A preferred shareholder who does not wish to give a release does not have to, but will be forgoing any distribution. The cases cited by the Equity Committee do not compel a different result because the release provision in this case is voluntary and is applicable equally to all creditors and shareholders, rather than applicable only to a creditor or shareholder that has a unique direct claim against the released parties. *See, e.g., AOV Indus.,* 792 F.2d at 1151 (finding unequal treatment because one creditor asserted it was being required to release a direct, rather than an indirect, claim against plan funder); *Conseco,* 301 B.R. at 528 (finding

releases which were consensual did not violate the Bankruptcy Code).

### 7. *Use of Liquidating Trust structure*

The LTW Holders argue that the Modified Plan also violates the best interests of creditors test because it provides for the assignment of the estates' causes of action to a Liquidating Trust and the issuance to creditors of interests in the Trust. They contend that by using this mechanism, creditors will be required to pay capital gains tax now on the value of the interests in the Trust that are distributed to them, without any concomitant payment to them of any value for many years until the claims of the estate are litigated to judgment or settled. The LTW Holders argue that in a chapter 7 case they would not have any tax obligations until they actually received a distribution from the estate.

Because the Court is denying confirmation for other reasons, and directing the parties to mediation, the Court suggests that the parties consider a means to avoid negative tax consequences to creditors. *See infra* Part H.

### 8. *Distribution to WMB Senior Noteholders*

The Equity Committee objects to the distribution of $335 million of estate assets to WMB Senior Noteholders (Class 17A) because it asserts that they are not creditors of this estate. It contends that such a distribution provides no benefit to the estate and merely diverts assets that could be used to provide a distribution to legitimate creditors (or shareholders) of the Debtors.

The WMB Noteholders have asserted that they have claims against the Debtors for misrepresentations made by the Debtors in connection with the sale of the WMB Senior Notes. While they admit that such a claim would be subordinated under section 510(b), they contend that it

is nonetheless a legitimate claim against the Debtors. Rather than litigate this issue, the Debtors have agreed (apparently with the urging of the FDIC) to the payment of $335 million from the tax refunds for this class of creditors.

The Court finds that this resolution is a reasonable settlement of the dispute because it will avoid contentious and expensive securities litigation which could result in a significantly larger judgment against the Debtors. *See, e.g., TMT Trailer Ferry,* 390 U.S. at 424, 88 S.Ct. 1157; *In re RFE Indus., Inc.,* 283 F.3d at 165; *Martin,* 91 F.3d at 393.

### F. *Feasibility*

■ The Equity Committee argues that if more than 300 creditors elect to receive stock in the Reorganized Debtor,[41] then the Modified Plan will not be feasible. It contends that if the Reorganized Debtor has more than 300 shareholders, it will be required to comply with the reporting requirements of the Securities Exchange Act of 1934. Because the Debtors have not been complying with those requirements during the pendency of the bankruptcy case, the Equity Committee asserts that the Reorganized Debtor would be unable to file the delinquent reports and audited financial reports.

The Debtors do not dispute that it would be cost prohibitive to file the missing financial statements. The Debtors argue, however, that an entity that complies with SEC Staff Legal Bulletin No. 2 (Apr. 15, 1997, § II.c.) is not required to file any 10-Ks or 10-Qs while in chapter 11 nor to file any "missed" 10-Ks or 10-Qs upon emergence. They contend that they have com-

plied with the requirements in the Bulletin. The Debtors note that the SEC has not initiated any enforcement inquiry or suggested that the Debtors' financial reporting was deficient.

■ The Court finds that the Debtors have presented sufficient evidence that the Modified Plan could be feasible even if the Reorganized Debtor has more than 300 shareholders. Feasibility does not require that success be guaranteed but rather only a "reasonable assurance of compliance with plan terms." *In re Orlando Investors LP,* 103 B.R. 593, 600 (Bankr.E.D.Pa. 1989). *See also In re Briscoe Enters., Ltd., II,* 994 F.2d 1160, 1166 (5th Cir.1993) ("[I]t is clear that there is a relatively low threshold of proof necessary to satisfy the feasibility requirement."). Based on the foregoing, the Court finds that the Modified Plan meets the feasibility test under section 1129(a)(11).

### G. *Miscellaneous Other Objections*

#### 1. *WMI Senior Noteholders' Group*

The Modified Plan provides that WMI Senior Noteholders will receive their pro rata share of Creditor Cash and Liquidating Trust Interests totaling their aggregate claims plus post-petition interest. (D 255 at § 6.1.) In addition, to the extent that WMI Senior Noteholders do not get paid in full in cash on the Effective Date, WMI Senior Noteholders were entitled to elect to receive stock in the Reorganized Debtor in lieu of a distribution of cash or Liquidating Trust Interests. (*Id.* at § 6.2.) Approximately $24 million in WMI Senior Noteholders did elect to receive stock in lieu of cash or Liquidating Trust Interests. (D.I. 8108 at 32.)

---

**41.** The Debtors' claims agent could not testify as to the exact number of creditors who will hold stock in the Reorganized Debtor, either by election or default. (Tr. 7/13/2011 at 90–91.) In addition, the Modified Plan provides

the holders of Disputed Claims, including the LTW Holders, the right to elect stock if their claims are allowed, which may not be known for some time. (D 255 at § 27.3.)

The WMI Senior Noteholders' Group and the WMI Senior Noteholders' Indenture Trustee object to the Modified Plan contending it violates the absolute priority rule by providing for a distribution (of cash, stock and interests in the Liquidating Trust) to junior creditors before the Senior Notes are paid in full *in cash,* as mandated by the subordination provisions of the Indentures. (WMI NG 1 at § 15.2; WMI NG 2 at § 15.2; WMI NG 4 at § 15.03; WMI NG 6 at § 12.2(b); WMI NG 7 at § 6.1(c).) *See also In re West-Point Stevens, Inc.,* 600 F.3d 231, 255–56 (2d Cir.2010) (holding that under terms of subordination agreement, senior creditors were entitled to be paid in full in cash before subordinated creditors could receive distribution under plan).

The Court rejects the argument of the WMI Senior Noteholders' Group and the WMI Senior Noteholders' Indenture Trustee. First, the language of the Indentures do not support their argument. For example, section 15.2 of the First Supplemental Indenture for the Senior Debt Securities provides in relevant part that "[i]n the event of . . . bankruptcy . . . such Senior Debt shall be first paid and satisfied in full before any payment or distribution of any kind or character, whether in cash, property or securities . . . shall be made upon the [Junior] Securities. . . ." (WMI NG 1 at § 15.2. *See also,* WMI NG 2 at § 15.2; WMI NG 4 at § 15.03; WMI NG 6 at § 12.2(b).) Those sections merely require that the WMI Senior Noteholders' claims be "paid and satisfied in full" not that they be paid in cash. (*Id.*) The WMI Senior Noteholders are, in fact, being "paid and satisfied in full" under the Modified Plan by the payment to them of a combination of cash and Liquidating Trust Interests and/or, if they so elected, stock in the Reorganized Debtor. They are entitled to no more under the provisions of the Indentures.

Section 6.1(e)(1) of the First Supplemental Indenture relating to the PIERS contains different language but the result is the same. (WMI NG 7 at § 6.1(e)(1).) It provides that "[i]n the event of and during the continuance of any event specified in Section 6.1(a) [which includes a bankruptcy case] unless all Senior Indebtedness is paid in full in cash, or provision shall be made therefor" payments made by the Debtors to the PIERS shall be segregated for the benefit of the Senior Noteholders. (*Id.*) Under the Modified Plan, provision has been made for the payment of the Senior Noteholders from the cash that the Debtors have on hand or from cash distributions from the Liquidating Trust. To the extent that the Senior Noteholders have elected to receive stock in lieu of cash, they have consented to the "provision" for the payment of their claims in that manner.

■ Second, the Senior Noteholders have accepted their treatment under the Modified Plan overwhelmingly, by more than 99% in amount and in number. (D.I. 8113 at 9; Tr. 7/13/2011 at 65.) Therefore, even if the Modified Plan did not comply with the requirements of the subordination agreements, the Court finds that the Senior Noteholders have waived that failure. *See, e.g., Bartle v. Markson Bros., Inc.,* 314 F.2d 303, 305 (2d Cir.1963) (refusing to reverse bankruptcy referee's finding that plan was in best interests of creditors although it violated subordination agreement because senior creditors had knowingly voted to accept plan that waived their rights). *See also* 4 Collier on Bankruptcy ¶ 510.03[3] (Alan N. Resnick & Henry Sommer eds., 16th ed. 2011) ("If subordination agreements were not waivable under a plan of reorganization acceptable to the senior creditor, the section would prevent just what Congress envisioned: that

senior creditors may compromise with junior creditors in order to confirm a plan.").

▇▇▇▇ Third, the Bankruptcy Code does not require that the WMI Senior Noteholders be paid in cash before junior creditors receive a distribution. *See, e.g., Case,* 308 U.S. at 117, 60 S.Ct. 1 ("In application of this rule of full or absolute priority this Court recognized certain practical considerations and made it clear that such rule did not 'require the impossible, and make it necessary to pay an unsecured creditor in cash as a condition of stockholders retaining an interest in the reorganized company. His interest can be preserved by the issuance, on equitable terms, of income bonds or preferred stock.'") (quoting *N. Pac. Ry. Co. v. Boyd,* 228 U.S. 482, 508, 33 S.Ct. 554, 57 L.Ed. 931 (1913)). The payment under the Modified Plan of cash, Liquidating Trust Interests, or stock of a value equal to their claims satisfies the absolute priority rule and provides the Senior Noteholders with payment in full of their claims.

### 2. *LTW Holders*

The LTW Holders object to confirmation of the Modified Plan because they contend that the PIERS are improperly treated as creditors rather than as equity. They argue that part of the PIERS claims are based on the accretion of an original issue discount that the claims had because of the value of warrants that were issued in connection with the PIERS.

The Court rejects this argument. The same argument was raised by the LTW Holders in connection with the Sixth Amended Plan. In the January 7 Opinion, the Court found that the PIERS hold preferred stock issued by WMCT 2001 and that WMCT 2001 holds debt of the Debtors. 442 B.R. at 361. Therefore, the Court concluded that unless WMCT 2001 had been merged into the Debtors (as had

several other affiliates), the PIERS claims were debt. *Id.* at 362.

At the confirmation hearings held in connection with the Modified Plan, the Debtors presented evidence that WMCT 2001 did not merge with the Debtors and remains a separate entity. (Tr. 7/14/2011 at 20–33; D 401.) Consequently, it is clear that the PIERS are debt, not equity.

### H. *Equity Committee Standing Motion*

The Equity Committee has recently filed a motion for authority to prosecute an action to equitably subordinate or disallow the Settlement Noteholders' claims. (D.I. 8179.) The parties agreed to present evidence, brief and argue those issues in conjunction with confirmation of the Modified Plan.

▇▇▇▇ In order for the Court to grant the Equity Committee's motion, the Court must find that it has stated a "colorable" claim which the Debtors have unjustifiably refused to prosecute. *See Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery,* 330 F.3d 548, 566–67 (3d Cir.2003). The party seeking standing bears the burden of proof. *G–I Holdings, Inc. v. Those Parties Listed on Exhibit A (In re G–1 Holdings, Inc.),* 313 B.R. 612, 629 (Bankr.D.N.J.2004).

▇▇▇▇ The Court finds, through the Debtors' support of the Settlement Noteholders' opposition to the Equity Committee's motion, that the Debtors have refused to pursue the equitable subordination or disallowance claim. Whether that was justified depends on whether the claim is colorable and the costs of pursuing that claim. *See, e.g., In re STN Enters.,* 779 F.2d 901, 905 (2d Cir.1985) (noting that in order to determine whether the refusal to prosecute the claim was unjustified the court must balance the

probability of success against the financial burden the suit would have on the estate).

 The threshold for stating a colorable claim is low and mirrors the standard applicable to a motion to dismiss for failure to state a claim.[42] *See, e.g., In re Centaur, LLC,* No. 10–10799, 2010 WL 4624910, at *4 (Bankr.D.Del. Nov. 5, 2010) ("In deciding whether there is a colorable claim, the court should undertake the same analysis as when a defendant moves to dismiss a complaint for failure to state a claim."); *In re Adelphia Commc'n Corp.,* 330 B.R. 364, 376 (Bankr.S.D.N.Y.2005) (noting that the burden of showing a colorable claim is a "relatively easy one").

1. *Claim for equitable subordination*

In its objection to confirmation, the Equity Committee contends that there is a viable claim for equitable subordination of the Settlement Noteholders' claims. An individual shareholder raised the same objection. The Settlement Noteholders argued preliminarily that the objection is procedurally defective. *See, e.g., Protarga v. Webb (In re Protarga),* Adv. No. 04–53374, 2004 WL 1906145, at *3 (Bankr. D.Del. Aug. 25, 2004) ("Claims for equitable subordination must be brought as a separate adversary proceeding pursuant to Rule 7001(8)....."). The Equity Committee's motion for authority to bring an ad-

versary action solves that procedural requirement.

 The Settlement Noteholders and the Creditors' Committee contend, however, that the Equity Committee and shareholders do not have standing to bring an equitable subordination claim based on the requirements of the Constitution because they have suffered no damages which could be remedied by equitable subordination. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (discussing the three elements needed for standing: (1) an injury in fact, which is concrete, particularized and actual or imminent; (2) a causal connection between the injury and the conduct; and (3) a likelihood that the injury will be redressed by a favorable decision). They argue that even if the Settlement Noteholders' claims are subject to equitable subordination,[43] they would simply be subordinated to other creditors' claims and still be paid ahead of equity. *See, e.g., Adelphia Recovery Trust v. Bank of Am., N.A.,* 390 B.R. 80, 99 (S.D.N.Y.2008) (granting motion to dismiss equitable subordination claim by creditors of parent against lenders of subsidiary because "[i]t follows reasonably from the judicial and legislative interpretations of the statute that the 'other creditors' whose welfare is the primary focus of equitable subordination law must be creditors of the same debtor, as a given claim may not be subor-

---

42. While the Settlement Noteholders assert that the Court should apply a summary judgment standard because it has considered the extensive evidence presented at the confirmation hearings, the Court declines to do so because it substantially restricted the discovery which the Equity Committee could take on this issue.

43. In order to show a valid claim for equitable subordination three elements are required: (1) engagement in some type of inequitable conduct; (2) the misconduct resulted

in injury to the creditors or created an unfair advantage to the defendant; and (3) the equitable subordination of the claim must be consistent with the provisions of the Bankruptcy Code. *See, e.g., United States v. Noland,* 517 U.S. 535, 538–39, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996); *Citicorp Venture Cap. Ltd. v. Comm. of Creditors Holding Unsecured Claims,* 160 F.3d 982, 986–87 (3d Cir.1998); *In re Mobile Steel Co.,* 563 F.2d 692, 699–700 (5th Cir.1977).

dinated to an equity interest, but only to another claim.").

■ The Court agrees with the Settlement Noteholders and the Creditors' Committee that under the plain language of the statute equitable subordination only permits a creditor's claim to be subordinated to another claim and not to equity. *See* 11 U.S.C. § 510(c) (providing for equitable subordination of "all or part of an allowed claim to all or part of another allowed claim"). Equitable subordination is not a remedy available to (or of much help in redressing any injury to) the shareholders for the Settlement Noteholders' actions. Therefore, the Court finds that the Equity Committee has failed to state a colorable claim for equitable subordination of the Settlement Noteholders' claims.

### 2. *Claim for equitable disallowance*

#### a. *Availability of Remedy*

■ The Equity Committee contends alternatively that, because of the improper conduct of the Settlement Noteholders in trading on material non-public information, the equitable disallowance of their claims is warranted so that any distribution to which they would be entitled is redistributed to other creditors and ultimately to the shareholders.[44] *See, e.g., Citicorp,* 160 F.3d at 991 & n. 7 (3d Cir.1998) (affirming equitable subordination of insider's claim to other creditors because of trading on insider information, but not precluding additional remedies such as equitable disallowance and an award of expenses, fees, and other costs caused by insider's con-

duct); *Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.),* 365 B.R. 24, 71–73 (Bankr.S.D.N.Y. 2007) (denying motion to dismiss because equitable disallowance of claims by bankruptcy court remains viable cause of action and equitable subordination is not the exclusive remedy for wrongdoing), *aff'd in relevant part,* 390 B.R. 64, 74–75 (S.D.N.Y. 2008).

The Equity Committee argues that equitable disallowance of the Settlement Noteholders' claims is warranted in this case because they traded on insider information obtained while they participated in settlement negotiations with the Debtor and JPMC. *See Pepper v. Litton,* 308 U.S. 295, 311, 60 S.Ct. 238, 84 L.Ed. 281 (1939) (holding that claim of insider who traded on inside information was properly subordinated on equitable principles).

The Equity Committee contends that the instant case is the "paradigm case of inequitable conduct by a fiduciary." *Citicorp,* 160 F.3d at 987. Like the creditor in *Citicorp,* the Equity Committee contends that the Settlement Noteholders purchased (and sold) the Debtors' securities with "the benefit of non-public information acquired as a fiduciary" for the "dual purpose of making a profit and influenc[ing] the reorganization in [their] own self-interest." *Id. See also Wolf v. Weinstein,* 372 U.S. 633, 642, 83 S.Ct. 969, 10 L.Ed.2d 33 (1963) ("Access to inside information or strategic position in a corporate reorganization renders the temptation to profit by trading in the Debtor's stock particularly pernicious.").

---

**44.** The Indenture Trustee for the PIERS contends that even if the Court equitably disallows the claims of the Settlement Noteholders, the Indenture Trustee as the holder of the claims is still entitled to payment of 100% of those claims. The Court disagrees. To the extent the Court disallows those claims, they are disallowed regardless of who holds them.

*Cf. Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.),* 379 B.R. 425, 439–45 (S.D.N.Y.2007) (concluding that transferee of a claim could be subject to equitable subordination and disallowance under section 502(d) for conduct of transferor if claim was assigned, though not if it was sold).

The Settlement Noteholders contend initially that equitable disallowance is not a valid remedy under the Bankruptcy Code, because it is not one of the specific exceptions to allowance of a claim articulated in section 502(b). *See, e.g., Travelers Casualty & Surety Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 449–50, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007) (holding that Bankruptcy Code does not bar contractual claim for attorneys' fees incurred during bankruptcy case because it was not disallowable under one of the nine exceptions to disallowance under section 502(b)). *See also Mobile Steel,* 563 F.2d at 699 (concluding that "equitable considerations can justify only the subordination of claims, not their disallowance"). The Settlement Noteholders argue that the legislative history of the Code supports this argument, citing a version of the Senate bill that did not get included in the Bankruptcy Code, which would have provided that "the court may disallow, in part or in whole, any claim or interest in accordance with the equities of the case." S. 2266, 95th Cong. § 510(c)(3) (1977).

The Equity Committee responds that both arguments were rejected in the *Adelphia* case. 365 B.R. at 71, *aff'd in relevant part,* 390 B.R. at 74–75. The Bankruptcy Court in *Adelphia* noted that there is other legislative history that expressly states that section 510 "is intended to codify case law, such as *Pepper v. Litton* . . . and is not intended to limit the court's power in any way.'" 365 B.R. at 71 (citing Kenneth N. Klee, *Legislative History of the New Bankruptcy Law,* 28 DePaul L. Rev. 941 (1979), *reprinted in* Collier on Bankruptcy, App. Pt. 4–1495). As a result, the District Court in *Adelphia* concluded that "the Court cannot give any weight to the omission of Section 510(c)(3) of S. 2266 from the Bankruptcy Code, Congress could have decided to do away with equitable disallowance, or it could

have thought specific reference to it was superfluous." 390 B.R. at 76.

In addition, the District Court in *Adelphia* held that the *Travelers* decision did not overturn the *Pepper v. Litton* decision which "fairly read, certainly endorses the practice (in appropriate circumstances) of the equitable disallowance of claims, not on the basis of any statutory language, but as within the equitable powers of a bankruptcy court." *Id.*

■■ Here, the Court agrees with the well-reasoned decisions of the Bankruptcy and District Courts in *Adelphia* and concludes that it does have the authority to disallow a claim on equitable grounds "in those extreme instances—perhaps very rare—where it is necessary as a remedy." *Adelphia,* 365 B.R. at 73. *See also, Citicorp,* 160 F.3d at 991 n. 7 (disagreeing with district court's conclusion that equitable subordination was the exclusive remedy available for inequitable conduct and noting that *Pepper v. Litton* expressly upheld the bankruptcy court's power to disallow or subordinate a claim based on equitable grounds).

The cases cited by the Settlement Noteholders do not foreclose the equitable disallowance of claims albeit under a different analysis. *Cf. Travelers,* 549 U.S. at 449–50, 127 S.Ct. 1199 (holding that "Section 502(b)(1) disallows any claim that is 'unenforceable against the debtor . . . under any agreement or applicable law' . . . [which is] most naturally understood to provide that, with limited exceptions, any defense to a claim that is available outside of the bankruptcy context is also available in bankruptcy."); *Mobile Steel,* 563 F.2d at 699 n. 10 (concluding that equitable disallowance of claims is not available because it "would add nothing to the protection against unfairness already afforded the bankrupt and its creditors. . . . If the misconduct direct-

ed against the bankrupt is so extreme that disallowance might appear to be warranted, then surely the claim is either invalid or the bankrupt possesses a clear defense against it."). Because the Equity Committee seeks to disallow the claims of the Settlement Noteholders under facts that suggest they violated the securities laws, the Court believes that the Debtors would have a defense to those claims outside of the bankruptcy context as well. *See, e.g., SEC v. Universal Express, Inc.,* 646 F.Supp.2d 552 (S.D.N.Y.2009) ("In addition to its discretion to order disgorgement, a court has the discretion to award prejudgment interest on the amount of disgorgement and to determine the rate at which such interest should be calculated. Awarding prejudgment interest, 'like the remedy of disgorgement itself, is meant to deprive wrongdoers of the fruits of their ill-gotten gains from violating securities laws.'") (quoting *SEC v. Lorin,* 877 F.Supp. 192, 201 (S.D.N.Y.1995), *aff'd in part and vacated in part,* 76 F.3d 458 (2d Cir.1996)); *SEC v. Haligiannis,* 470 F.Supp.2d 373, 385–86 (S.D.N.Y.2007) (holding that civil monetary penalties can be awarded for securities violations, which "are designed to punish the individual violator and deter future violations of the securities laws," and awarding civil monetary penalties of $15 million, roughly the amount of the defendant's ill-gotten gains).

### b. *Merits of claim*

■ In *Pepper v. Litton,* the Supreme Court upheld the equitable disallowance of the claim of an insider who traded on material inside information, concluding that:

> He who is in … a fiduciary position…. cannot utilize his inside information and his strategic position for his own preferment. He cannot violate rules of fair play by doing indirectly through the corporation what he could not do directly.

> He cannot use his power for his personal advantage and to the detriment of the stockholders and creditors no matter how absolute in terms that power may be and no matter how meticulous he is to satisfy technical requirements.

308 U.S. at 311, 60 S.Ct. 238.

The TPS Group contends that, although the Court need not decide that the Settlement Noteholders have violated the securities laws, reference to insider trading cases illustrates the magnitude of the Settlement Noteholders' inequitable conduct.

■ The Supreme Court has recognized two theories of insider trading under section 10(b): the "classical theory" and the "misappropriation theory." *See SEC v. Cuban,* 620 F.3d 551, 553 (5th Cir.2010). Under the classical theory, section 10(b) and Rule 10b–5 are violated when a corporate insider (i) trades in the securities of his corporation (ii) on the basis of (iii) material nonpublic information (iv) in violation of the fiduciary duty owed to his shareholders. *See, e.g., U.S. v. O'Hagan,* 521 U.S. 642, 651–52, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997) ("Trading on such information qualifies as a 'deceptive device' under § 10(b) … because 'a relationship of trust and confidence [exists] between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation.'") (citation omitted). Under the misappropriation theory, by contrast, a corporate "outsider" violates section 10(b) and Rule 10b–5 "when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information" rather than a duty owed to the persons with whom he trades. *Id.* at 652, 117 S.Ct. 2199.

The Equity Committee and the TPS Group both assert that the Settlement Noteholders' conduct violated the classical

theory of insider trading. In addition, the TPS Group asserts that Centerbridge violated the misappropriation theory.

### i. *Classical theory*

#### (1) *Material nonpublic information*

The Settlement Noteholders argue that they did not trade on any material nonpublic information. Instead, they contend that the only material nonpublic information which they received from the Debtors during the confidentiality periods were the estimated amounts of the Debtors' tax refunds, which were disclosed by the Debtors to the public before the Settlement Noteholders began to trade again.

The Equity Committee and the TPS Group assert that the Settlement Noteholders received additional nonpublic information including the knowledge that a settlement was being discussed and the relative stances the parties were taking in those negotiations. In particular, the Equity Committee and the TPS Group focus on the term sheets exchanged by the parties. According to the Equity Committee, the parties were conceding issues at a time when the public knew only that the Debtors, JPMC, and the FDIC were engaged in contentious litigation.

■■■■■ Materiality of nonpublic information is determined by an objective, "reasonable investor" test: "[T]he law defines 'material' information as information that would be important to a reasonable investor in making his or her investment decision." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir.1997). With regard to information on events like

a potential merger, courts determine materiality based on a balancing of both the "indicated *probability* that the event will occur and the anticipated *magnitude* of the event in light of the totality of the company activity." *Basic, Inc. v. Levinson*, 485 U.S. 224, 238, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (emphasis added).

■■■ The parties largely do not dispute that the magnitude of a global settlement with JPMC and the FDIC would be great in this case.[45] *See, e.g., SEC v. Geon Indus., Inc.*, 531 F.2d 39, 47–48 (2d Cir.1976) (stating that "[s]ince a merger in which [a company] is bought out is the most important event that can occur in a small corporation's life, to wit, its death, we think that inside information, as regards a merger of this sort, can become material at an earlier stage than would be the case as regards lesser transactions—and this even though the mortality rate of mergers in such formative stages is doubtless high."). The issue the parties in this case dispute is the probability that a settlement would occur, specifically whether the negotiations were too tentative and the parties were too far apart.

The Debtors and the Settlement Noteholders contend that neither the knowledge of negotiations nor the parties' relative stances during the negotiations were material non-public information because of the extreme distance between the parties' stances and the ebbs and flows of the negotiation process. *See, e.g., Taylor v. First Union Corp. of S.C.*, 857 F.2d 240, 244–45 (4th Cir.1988) (holding that "pre-

---

**45.** Owl Creek alone argues that the magnitude factor is not met here because, unlike a merger, settlement proposals are a common and necessary component of bankruptcy cases. The Court agrees that settlement proposals are common, but also notes that statements of interest and merger proposals are just as common and yet may be material.

*Basic,* 485 U.S. at 238–39, 108 S.Ct. 978. What the magnitude factor measures is not the fact that a proposal was made, but what the result of the proposal would be if accepted (i.e. the actual merger or settlement were consummated). *SEC v. Geon Indus., Inc.,* 531 F.2d 39, 47–48 (2d Cir.1976).

liminary, contingent, and speculative" negotiations were immaterial because there was "no agreement as to the price or structure of the deal"); *Filing v. Phipps*, No. 5:07CV1712, 2010 WL 3789539, at *5–6 (N.D.Ohio Sept. 24, 2010) (finding that merger talks were not material where parties had a "get acquainted" meeting and discussed executing a confidentiality agreement); *Levie v. Sears Roebuck & Co.*, 676 F.Supp.2d 680, 688 (N.D.Ill.2009) (finding merger discussions not material where they were preliminary in nature).

According to the Settlement Noteholders, it would have been sheer speculation that JPMC's position on one or more potential settlement terms in March or November 2009 could have provided assurance that JPMC would take that same position in future complex, multi-party, multi-issue negotiations. In the context of such a complex negotiation, the Settlement Noteholders argue that the discussions could only be material once all the parties reached an agreement in principal or at least came extremely close to a deal. (D.I. 8429 at 10.)

The Court disagrees with this statement of materiality. The Supreme Court has explicitly rejected the argument that there is no materiality to discussions until an agreement-in-principle has been reached. *Basic*, 485 U.S. at 237, 108 S.Ct. 978. In addition, the cases cited by the Plan Supporters are distinguishable as they deal only with preliminary discussions. Unlike the cases cited, here the parties executed confidentiality agreements, exchanged a significant amount of information, and engaged in multi-party negotiations for over a year. The discussions went far beyond a mere "get acquainted meeting." *Filing*, 2010 WL 3789539, at *5–6.

The Settlement Noteholders contend that whether a settlement was likely to occur should be evaluated in light of the facts as they existed at the time, not with the benefit of hindsight. *See, e.g., In re General Motors Class E Stock Buyout Sec. Litig.*, 694 F.Supp. 1119, 1127 (D.Del.1988) ("The probability of a transaction occurring must be considered in light of the facts as they then existed, not with the hindsight knowledge that the transaction was or was not completed."). According to the Settlement Noteholders, in this case at the conclusion of both confidentiality periods, the parties felt that the negotiations were dead and, therefore, they were not material.

The Court is not convinced, however, by this contention. *See, e.g., SEC v. Gaspar*, 83 Civ. 3037, 1985 WL 521, at *14 (S.D.N.Y. Apr. 16, 1985) ("The ultimate success of the negotiations is only one factor to consider" in determining materiality). The first set of negotiations ended in March, with the Settlement Noteholders claiming they were a "disaster," yet the Debtors continued to negotiate with JPMC in April. (Tr. 7/20/2011 at 55–56.) In fact, Aurelius and Owl Creek berated the Debtors for conducting settlement talks during that time without them, indicating that the Settlement Noteholders themselves viewed the negotiations as continuing and material. (Tr. 7/18/2011 at 73.)

The contention that settlement negotiations were dead (and therefore not material) is also belied by the actions of Centerbridge and Appaloosa. In July and August 2009 they engaged in their own separate negotiations with JPMC, at which time they both restricted their trading, even though they had not received any other information from the Debtors.[46]

---

**46.** Centerbridge stated that such restrictions were taken only out of "an abundance of caution" but admitted that an acceptable counterproposal from JPMC might "nudge

The Equity Committee argues that the fact that there was early agreement on several terms of the settlement negotiations made them particularly material. The Settlement Noteholders disagree, asserting that the market already understood the two major components of any deal: that the Debtors were likely to prevail in retaining ownership of the disputed bank deposits and that, as a predicate for a plan, some agreement on the tax refunds would have to be reached between the Debtors and JPMC. *See Elkind v. Liggett & Myers, Inc.,* 635 F.2d 156, 166 (2d Cir. 1980) (finding that the confirmation of facts that "were fairly obvious to all who followed the stock ... cannot be deemed 'reasonably certain to have a substantial effect on the market price of the security.' ").

Again, the Court disagrees. There is no evidence in the record that the market knew that the Debtors would prevail on the disputed bank deposits or that there would be a settlement on the tax refunds. All the public knew was that the Debtors, JPMC, and the FDIC were litigating those issues. In fact, the Court was prepared to issue a decision on the summary judgment motions filed by the parties on the bank deposit issue when the GSA was announced.

The Settlement Noteholders argue further that the probability of a settlement cannot be evaluated based on agreement on a few terms but must be viewed as a whole. Despite the fact that some terms did not change, the Settlement Noteholders note that many terms were constantly changing as later term sheets were exchanged. (Tr. 7/21/2011 at 109.) At one

the negotiations towards the 'materiality' end of the spectrum of the settlement negotiations, in that an acceptable proposal could lead to further fruitful negotiations." (D.I. 8430 at 17–18.) The Court is unconvinced by

point, JPMC changed its stance in the negotiations so drastically that the Debtors viewed it as essentially "reset[ting] the bookends" of any potential deal. (EC 16; Tr. 7/18/2011 at 108.) The Settlement Noteholders warn that if disclosure of the constantly changing settlement terms was required, it "would result in endless bewildering guesses as to the need for disclosure, operate as a deterrent to the legitimate conduct of corporate operations, and threaten to 'bury the shareholders in an avalanche of trivial information.' " *Taylor,* 857 F.2d at 245.

This same argument was denounced by the Supreme Court when it rejected the "agreement-in-principle" standard for evaluating materiality of merger discussions and applies equally here.

Three rationales have been offered in support of the "agreement-in-principle" test. The first derives from the concern expressed in *TSC Industries* [*v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) ] that an investor not be overwhelmed by excessively detailed and trivial information, and focuses on the substantial risk that preliminary merger discussions may collapse: because such discussions are inherently tentative, disclosure of their existence itself could mislead investors and foster false optimism.... The first rationale, and the only one connected to the concerns expressed in *TSC Industries,* stands soundly rejected, even by a Court of Appeals that otherwise has accepted the wisdom of the agreement-in-principle test. "It assumes that investors are nitwits, unable to appreciate—even when told—that mergers are risky propositions up until the closing." Disclo-

this explanation. Centerbridge admits that it determined quickly that JPMC's counter-proposal was inadequate, yet continued to restrict trading until six days after JPMC withdrew its counter-proposal.

sure, and not paternalistic withholding of accurate information, is the policy chosen and expressed by Congress. *Basic*, 485 U.S. at 237, 108 S.Ct. 978 (quoting *Flamm v. Eberstadt*, 814 F.2d 1169, 1175 (7th Cir.1987)).

The Plan Objectors disagree with the Settlement Noteholders' contention that the settlement negotiations were too tentative to be material. The TPS Group asserts that over the course of negotiations it became clear that a settlement was more probable (as issues were resolved) and that the funds available to the estate were increasing. The Plan Objectors argue that the materiality of the information is evident from the fact that as soon as the Settlement Noteholders were free to trade on that information they did: engaging in what the Equity Committee characterizes as a "buying spree" concentrating on acquiring (at a discount) junior claims because the Settlement Noteholders knew (although the public did not) that the junior creditors were likely to receive a recovery. (AOC 18; AOC 54; AOC 62; Au 8.)

The Equity Committee also asserts that a materiality inference can be drawn from the fact that the Settlement Noteholders requested (and the Debtors granted) a termination of the Second Confidentiality Period a day early, on December 30, 2009, in order to permit them to trade before the end of the year. (Tr. 7/18/2011 at 111.) *See, e.g., Basic*, 485 U.S. at 240 n. 18, 108 S.Ct. 978 ("We recognize that trading (and profit making) by insiders can serve as an indication of materiality."); *United States v. Victor Teicher & Co.*, No. 88 CR. 796, 1990 WL 29697, at *2 (S.D.N.Y. Mar. 9, 1990) (citing the "very fact of [defendant's] trading" as "evidence of the materiality of the information").

The Settlement Noteholders respond that materiality cannot be gleaned from the trades in question, however, because some of the Settlement Noteholders were selling while others were buying or not trading at all. (AOC 18; AOC 54; AOC 62; Au 8.) If the settlement discussions had any materiality, the Settlement Noteholders argue that they would have all traded in the same fashion. They point to Appaloosa and Centerbridge as an example. Both received a summary of the Debtors' April negotiations and JPMC's August counter-offer during their own separate negotiations, yet they engaged in opposite trades after receiving that information. (AOC 54; AOC 62.) In another instance, Aurelius sold PIERS on March 8, 2010, four days before the announcement of the GSA, after which the price of the PIERS skyrocketed. (Au 8.) According to the Settlement Noteholders, if Aurelius possessed material nonpublic information regarding the settlement, it would not have made such an unwise trade.

■ The fact that the Settlement Noteholders made unwise or contrary trades, however, does not provide a defense to an insider trading action. *See, e.g., SEC v. Thrasher*, 152 F.Supp.2d 291, 301 (S.D.N.Y.2001) (concluding that a tippee is potentially liable for insider trading even if it loses money by trading on false information) (citing *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 318, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985)).

The Court does find it difficult to draw any conclusions from the Settlement Noteholders' trades. The Settlement Noteholders actively traded in the Debtors' securities prior to, and after, the confidentiality periods. It is possible that their trades were based on the publically disclosed information regarding the tax refunds, but because full discovery on the Settlement Noteholders' internal trading decisions has not been permitted to date, the Court is unable to reach any conclusion based on the trades alone.

Based on the evidence presented thus far, however, it appears that the negotiations may have shifted towards the material end of the spectrum and that the Settlement Noteholders traded on that information which was not known to the public. Consequently, the Court finds that the Equity Committee has stated a colorable claim that the Settlement Noteholders received material nonpublic information. Further discovery would help shed light on how the Settlement Noteholders internally treated the settlement discussions and if they considered them material to their trading decisions.

### (2) Insider status

#### (a) Temporary Insider

Insiders of a corporation are not limited to officers and directors, but may include "temporary insiders" who have "entered into a special confidential relationship in the conduct of the business of the enterprise and are given access to information solely for corporate purposes." *Dirks v. SEC,* 463 U.S. 646, 655 n. 14, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983). *See also In re Krehl,* 86 F.3d 737, 743 (7th Cir.1996) (holding that "[a]ccess to inside information can be sufficient to confer insider status even where there is no legal right or ability to exercise control over a corporate entity"). The Equity Committee and the TPS Group contend that the Settlement Noteholders became temporary insiders when they were given material non-public information creating a fiduciary duty on their part towards other creditors and shareholders.

The Settlement Noteholders assert that temporary insider status under the securities law is inapplicable to situations where the corporation and the outsider work together toward a goal in which they each have diverse interests and only applies if they are working towards a common goal. *Dirks,* 463 U.S. at 655 n. 14, 103 S.Ct.

3255. According to the Settlement Noteholders, the Supreme Court's use of the phrase "solely for corporate purposes" in *Dirks* was meant to exclude instances where a corporate purpose may be one or even the "primary reason" among others. *Id.* Further, the Settlement Noteholders assert that the Debtors have always been aware that the Settlement Noteholders' purpose for participating in the negotiations was to further their own economic self interest. (Tr. 7/21/2011 at 185, 202.)

The Equity Committee responds that the Debtors only gave the Settlement Noteholders access to the settlement term sheets to further the Debtors' efforts to effectuate a consensual plan of reorganization, which was the common goal of both the Debtors and the Settlement Noteholders. This, it argues, satisfies the common corporate goal required by *Dirks,* 463 U.S. at 655 n. 14, 103 S.Ct. 3255. In addition, the Equity Committee argues that the Settlement Noteholders only obtained the information because they had acquired blocking positions in two subordinated classes of creditors (the senior subordinated notes and the PIERS). It contends that this is sufficient to create a fiduciary duty on their part to those two classes of creditors. *Cf. Rickel & Assocs., Inc. v. Smith (In re Rickel & Assocs., Inc.),* 272 B.R. 74, 100 (Bankr.S.D.N.Y.2002) (holding that creditors' committee member could not use his position on committee to advance his own personal interest at the expense of the unsecured creditors).

The Court finds that the Equity Committee has stated a colorable claim that the Settlement Noteholders became temporary insiders of the Debtors when the Debtors gave them confidential information and allowed them to participate in negotiations with JPMC for the shared goal of reaching a settlement that would form the basis of a consensual plan of reorganization.

(b) *Non-statutory insider*

Alternatively, the Equity Committee and TPS Group assert that the Settlement Noteholders owed duties as non-statutory insiders under bankruptcy law. *See, e.g., Luedke v. Delta Air Lines, Inc.,* 159 B.R. 385 (S.D.N.Y.1993) (holding that plaintiff stated a claim that creditors' committee assumed a duty to all parties by becoming a joint sponsor and proponent of plan); *In re Wash. Mut., Inc.,* 419 B.R. 271, 278 (Bankr.D.Del.2009) (noting that "members of a class of creditors may, in fact, owe fiduciary duties to other members of the class" when they hold themselves out as representing that class); *Official Comm. of Equity Sec. Holders of Mirant Corp. v. The Wilson Law Firm, P.C. (In re Mirant Corp.),* 334 B.R. 787, 793 (Bankr.N.D.Tex. 2005) ("[W]hen a party purports to act for the benefit of a class, the party assumes a fiduciary role as to the class."); *Rickel,* 272 B.R. at 100 (noting that creditors' committee member may not use his position to advance his personal interest at the expense of the creditor class); *In re Allegheny Int'l, Inc.,* 118 B.R. 282, 298 (Bankr. W.D.Pa.1990) (party who received "a great volume of information that was not available to other creditors, shareholders, and the general public" was a temporary insider). *See generally* Mark J. Krudys, *Insider Trading by Members of Creditors' Committees—Actionable!,* 44 DePaul L. Rev. 99, 142 (1994) (noting that "members of creditor steering committees, like official creditors' committees, appear to come within the temporary insider definition articulated in *Dirks*"); Donald C. Langevoort, 18 Insider Trading Regulation, Enforcement and Prevention § 3:8 (database updated April 2011) ("More recently, the view has been expressed that members of a creditors committee overseeing a reorganization of the issuer would be treated as [temporary] insiders"). *See also In re Winstar Commc'ns, Inc.,* 554 F.3d 382, 396–97 (3d Cir.2009) (holding that parties who do not fit the Bankruptcy Code definition of an insider may nonetheless be insiders if they have a sufficiently close relationship with the debtor to suggest that their transactions were not conducted at arm's length).

The Equity Committee has alleged and presented some evidence that the Settlement Noteholders could be considered insiders of the Debtors because of their status as holders of blocking positions in two classes of the Debtors' debt structure. As such, it could be found that they owed a duty to the other members of those classes to act for their benefit. Therefore, the Court finds that the Equity Committee has stated a colorable claim that the Settlement Noteholders are temporary insiders of the Debtors.

(3) *Knowledge*

The Settlement Noteholders assert that there is no evidence that they knowingly or recklessly traded while in possession of material nonpublic information, and, therefore, the required scienter element of an insider trading claim is lacking. *See, e.g., Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1422 (finding that scienter requires a "strong inference" that when trading the defendant "knew or recklessly disregarded" the fact that information in his possession was material). Because the Debtors explicitly agreed to disclose any material nonpublic information at the end of each confidentiality period, the Settlement Noteholders contend that they had no knowledge that the public did not know all material information. The Settlement Noteholders note that the burden was on the Debtors to assure that the disclosures were appropriate. (Au 16; Au 27; EC 24; EC 37; EC 111; EC 117; EC 141; EC 148.) *See also* Richard H. Walker, Div. of Enforcement, Sec. Exch. Comm'n, Regula-

tion FD—An Enforcement Perspective (Nov. 1, 2000), 2000 WL 1635668, at *2 (stating that the regulation "places the responsibility for avoiding selective disclosure, and the risks of engaging in it, squarely on the issuer" of the information).

The Equity Committee responds that good faith reliance on assurances of a third party, such as the source of the information, to disclose all material information to the public cannot be a defense. Such a rule would vitiate the insider trading laws if a third party's assurances, with no further duty of inquiry, automatically insulated a party from insider trading liability. Further, the Equity Committee asserts that there is clear circumstantial evidence (the volume of trades immediately after the confidentiality periods ended) which show that the Settlement Noteholders knowingly traded on the basis of the material, nonpublic information. *See, e.g., SEC v. Heider,* 90 Civ. 4636, 1990 WL 200673, at *4 (S.D.N.Y. Dec. 4, 1990) (allegations that volume of call option purchases spiked prior to merger and that defendants were responsible for a significant portion of that volume supported a "strong inference" of defendant's scienter).

The Settlement Noteholders disagree, asserting that the evidence of their trading does not support an inference of scienter. *Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1424 (declining to infer fraudulent intent from "trading in the normal course of events"). They argue that the trading volume can be attributed to other facts of public record such as the momentum of the tax bill through Congress and the Debtors' estimates of their tax refunds. While trades may provide circumstantial evidence of intent or recklessness, the statute only requires that the Settlement Noteholders have knowledge that they were in possession of material nonpublic information. Whether or not they

profited from such knowledge or actually applied such knowledge in trading is not a required element. *United States v. Teicher,* 987 F.2d 112, 120 (2d Cir.1993) (stating that "[u]nlike a loaded weapon which may stand ready but unused, material information can not lay idle in the human brain").

In addition the Court does not agree with the Settlement Noteholders' reliance exception to the scienter element of insider trading. The Settlement Noteholders each had strict internal policies prohibiting insider trading. (EC 3; EC 19; EC 103; AOC 16.) The Equity Committee contends that notwithstanding those internal policies, the Settlement Noteholders knowingly traded with knowledge that the Debtors were engaged in global settlement negotiations with JPMC of which the trading public was unaware. The Settlement Noteholders cannot use the Debtor or their own counsel as a shield if they violated those policies.

The Court finds that the Equity Committee has made sufficient allegations and presented enough evidence to state a colorable claim that the Settlement Noteholders acted recklessly in their use of material nonpublic information. *See Goldman v. McMahan, Brafman, Morgan & Co.,* 706 F.Supp. 256, 259 (S.D.N.Y.1989) ("An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases … be the functional equivalent of recklessness."); *Rolf v. Blyth, Eastman Dillon & Co., Inc.,* 570 F.2d 38, 47 (2d Cir.1978) ("Reckless conduct is … 'an extreme departure from the standards of ordinary care … to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.' ") (citation omitted).

ii. *Misappropriation theory*

The TPS Group also alleges that Centerbridge is liable under the mis-

appropriation theory which provides that insider trading can be found where "(1) ... the defendant possessed material, non-public information; (2) which he had a duty to keep confidential; and (3) ... the defendant breached his duty by acting on or revealing the information in question." *SEC v. Lyon*, 605 F.Supp.2d 531, 541 (S.D.N.Y.2009). Liability attaches where "the tippee traded on the misappropriated information when [it] knew or should have known it was misappropriated." *SEC v. Willis*, 777 F.Supp. 1165, 1169 (S.D.N.Y. 1991).

According to the TPS Group, the Debtors shared information about the April 2009 negotiations with Fried Frank which was under a written confidentiality agreement barring it from sharing information with its clients, unless they were subject to confidentiality agreements of their own. (EC 10; D 408.) Nonetheless, on July 1, 2009, Fried Frank shared summaries of the April negotiations with both Centerbridge and Appaloosa, who were not at the time subject to a confidentiality agreement with the Debtors. (EC 215.) Centerbridge continued to trade, while Appaloosa voluntarily restricted its trading. The TPS Group asserts that, as a result, Fried Frank breached its duty of confidentiality to the Debtors and Centerbridge misappropriated confidential information.

The TPS Group asserts that Centerbridge knew or should have known that the information was restricted and subject to Fried Frank's confidentiality obligations to the Debtors. (Tr. 7/21/2011 at 30–31.) *SEC v. Musella*, 578 F.Supp. 425, 442 (S.D.N.Y.1984) (finding knowledge where the individual was a "sophisticated ... market professional" who should have inquired about the "underlying circumstances of the tip received").

In addition, the Equity Committee contends that following the Second Confidentiality Period, material information was shared with the Settlement Noteholders by Fried Frank. The Settlement Noteholders contend, however, that although they had discussions and meetings with Fried Frank about the plan of reorganization, they received no material information from Fried Frank about the substance of the negotiations during this period. (Tr. 7/18/2011 at 116, 119; Tr. 7/19/2011 at 144; Tr. 7/20/2011 at 75; Tr. 7/21/2011 at 136.) The Court has substantial doubts about these assertions. Further discovery on this issue would clarify this point.

For all the above reasons, the Court finds that the Equity Committee and the TPS Group have stated a colorable claim that the Settlement Noteholders engaged in insider trading under the classical and misappropriation theories.

The Settlement Noteholders warn that any finding of insider trading will chill the participation of creditors in settlement discussions in bankruptcy cases of public companies. The Court disagrees. There is an easy solution: creditors who want to participate in settlement discussions in which they receive material nonpublic information about the debtor must either restrict their trading or establish an ethical wall between traders and participants in the bankruptcy case. These types of restrictions are common in bankruptcy cases. Members of creditors' committees and equity committees are always subject to these restrictions. *See e.g.*, Adelphia, 368 B.R. at 152 n. 11. The Court does not believe that a requirement to restrict trading or create an ethical wall in exchange for a seat at the negotiating table places an undue burden on creditors who wish to receive confidential information and give their input.

### c. *Burden on estate*

■ The Court is required, however, to balance the probability of success on the

claim against the burden on the estate that would result from its prosecution. Judging from the vigor with which the Settlement Noteholders have opposed the Equity Committee's standing motion, the Court is concerned that the case will devolve into a litigation morass. In addition, the Court notes that as the case continues, the potential recoveries for all parties in the case dwindles. Regardless of which parties prevail, they may be disappointed to find their recovery significantly less than expected.

Therefore, before the Equity Committee proceeds with its claim any further, the Court will direct that the parties go to mediation on this issue, as well as the issues that remain an impediment to confirmation of any plan of reorganization in this case. A status hearing to discuss this will be held at the omnibus hearing currently scheduled for October 7, 2011, 11:30 am.

## IV. *CONCLUSION*

For the foregoing reasons, the Court will deny confirmation of the Plan, grant but stay the Equity Committee's standing motion, and direct the parties to proceed to mediation.

An appropriate Order is attached.

### *ORDER*

**AND NOW** this 13th day of **SEPTEMBER, 2011**, upon consideration of the Modified Sixth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, filed on March 16, 2011, as modified on March 25, 2011 (the "Modified Plan"), for the reasons articulated in the accompanying Opinion, it is hereby

**ORDERED** that confirmation of the Modified Plan is **DENIED**; and it is further

**ORDERED** that the motion of the Equity Committee for standing to prosecute claim for equitable disallowance is **GRANTED** but **STAYED PENDING MEDIATION**; and it is further

**ORDERED** that a status hearing will be held on October 7, 2011, at 11:30 a.m. to consider the issues to be referred to a mediator in this case.